**PICKER INTERNATIONAL, INC., Plaintiff,**

v.

**Bruce LEAVITT and Imaging Equipment Services, Inc. and Thomas J. Quinn, Defendants.**

Civ. A. Nos. 87–2828, 87–2597.

United States District Court, D. Massachusetts.

Aug. 26, 1994.

James S. Dittmar, Hutchins & Wheeler, Boston, MA, for plaintiff Picker Intern., Inc.

William J. Doherty, Morrison, Mahoney & Miller, Springfield, MA, for defendant Bruce Leavitt.

Bruce Leavitt, pro se.

Richard C. Heidlage, Kelly L. Wilkins, Heidlage & Reece, Mark E. Tully, Goodwin, Proctor & Hoar, Boston, MA, William West, Stokes & Bartholomew, Nashville, TN, for defendant Imaging Equip. Services, Inc.

Richard C. Heidlage, Heidlage & Reece, Boston, MA, for defendant Thomas J. Quinn.

## MEMORANDUM AND ORDER

WOLF, District Judge.

Plaintiff Picker International, Inc.'s ("Picker") motion for partial summary judgment addresses federal antitrust and pendant state business tort counterclaims alleged by Defendant Imaging Equipment Services, Inc. ("Imaging"). For the reasons explained below, Picker's motion for summary judgment must be allowed on all counts of Imaging's counterclaims.

## I. Facts

Unless otherwise noted, all of the following facts are uncontested and presented in the light most favorable to Imaging.

Picker International, Inc. is a New York corporation with a principal place of business in Highland Heights, Ohio. Picker designs, manufactures, sells, and services medical diagnostic equipment such as computed tomography scanners ("CT Scanners"), magnetic resonance imaging, nuclear imaging, and x-ray equipment. Affidavit of William J. Webb ("Webb Aff."), Picker's Appendix of Evidentiary Materials in Support of its Motion for Partial Summary Judgment ("Picker Evid. App."), Ex. 13, ¶¶ 10–12.

Imaging Equipment Services, Inc. is a Pennsylvania corporation with a principal place of business in Pittsburgh, Pennsylvania. Imaging is an independent service organization ("ISO"), which provides maintenance and repair services to end-users of a variety of medical diagnostic equipment. Affidavit of Robert S. Pindyck ("Pindyck Aff."), Picker Evid.App., Ex. 6, ¶ 11; Webb. Aff., Ex. 13, ¶ 11. Imaging competes with Picker to service Picker brand CT Scanners.

On April 9, 1991, Imaging filed a voluntary petition, under Chapter 11 of the Bankruptcy Code, in the United States Bankruptcy Court for the Western District of Pennsylvania. On March 2, 1992, Imaging's amended plan of reorganization was approved. Answer of Imaging ¶ 4; Picker Evid.App., Ex. 27; Ex. 30.

On July 6, 1994, after a hearing on Picker's motion for summary judgment, and after this case was scheduled for trial, Imaging again filed a voluntary petition for bankruptcy in Pennsylvania. Picker subsequently obtained limited relief from the automatic stay of civil litigation against Imaging in order to permit this case to proceed.

Thomas J. Quinn ("Quinn"), a resident of Mars, Pennsylvania, is President of Imaging. Deposition of Thomas J. Quinn ("Quinn Dep."), Picker Evid.App., Ex. 19 at I–4 to I–5.

Bruce Leavitt ("Leavitt") is a former Picker service engineer, who until recently was employed by Imaging. Id. at I–38 to I–39.

Picker sells its CT Scanners to hospitals and other medical facilities in competition with other manufacturers, including General Electric, Siemens, Philips, Toshiba, Elscint, and Shimadzu. Picker Evid.App., Pindyck Aff., Ex. 6, ¶¶ 10, 31; Webb. Aff., Ex. 13, ¶ 5.

Picker's largest competitor is General Electric, whose sales since 1986 have constituted about 40% of the United States market. *Id.* Picker's share of the United States market has ranged from between 15% to 19%, making it at various times the nation's third or second largest manufacturer of CT Scanners. *Id.*

Since 1985, the purchase price of a CT Scanner has ranged from $400,000 to over $1,000,000. Picker Evid.App., Pindyck Aff., Ex. 6, ¶ 9; Webb. Aff., Ex. 13, ¶ 6. CT Scanners are used by hospitals and other medical facilities to conduct various diagnostic procedures. These end-users are sophisticated consumers. Picker Evid.App., Pindyck Aff., Ex. 6, ¶¶ 12–14; Webb. Aff., Ex. 13, ¶¶ 7–8, 16–18. They seek to maximize the use of, and economic return on, their CT Scanners by minimizing the time during which the CT Scanner is not working ("down time"). *Id.*

CT Scanners typically have a useful life of eight to ten years. Picker Evid.App., Pindyck Aff., Ex. 6, ¶ 9. As delicate, precision machines, they require substantial servicing. *Id.,* Pindyck Aff., Ex. 6, ¶ 17; Webb. Aff., Ex. 13, ¶ 20. Picker claims that the cost of servicing often equals or exceeds the original purchase price of the unit. *Id.* Generally, CT Scanners require preventative maintenance on a bi-weekly basis, consisting of several hours of diagnostic routines and trouble-shooting. *Id.,* Ex. 13, ¶ 18. In addition, component parts of a CT Scanner require frequent replacement as part of the servicing schedule. *Id.,* Ex. 6, ¶ 15; Ex. 13, ¶ 18.

Imaging disputes Picker's claim that the cost of servicing a CT Scanner often exceeds its purchase price, particularly if the CT Scanner tubes, which are consumable items designed to be replaced, are not included in service costs. Imaging's Memorandum of Law in Opposition to Picker's Motion for Partial Summary Judgment ("Mem. Opp'n") at 5–6. In addition, Imaging states that Picker's life cycle costs are calculated on the basis of sales and service by a manufacturer of CT Scanners, suggesting that the cost is lower where service is provided by an ISO. *Id.* at 6 n. 1.

Manufacturers like Picker service only the CT Scanners they manufacture, offer a warranty on their service and parts, and often also offer extended warranties at the time of sale. Picker Evid.App., Pindyck Aff., Ex. 6, ¶¶ 11; Webb. Aff., Ex. 13, ¶¶ 13–14. Upon the expiration of the warranty, manufacturers typically offer service under flat-fee contracts for a fixed period of time, or on a time and materials basis. *Id.*

Although most CT Scanners are serviced by the manufacturer, maintenance alternatives exist. *Id.* Specifically, there are ISOs like Imaging which provide service under flat fee contracts or on a time and materials basis. *Id.,* Webb. Aff., Ex. 13, ¶ 15. In addition, some CT Scanner owners establish in-house service departments. *Id.*

Because of the substantial cost of servicing a CT Scanner, Picker contends that customers weigh this factor when choosing among the products of competing manufacturers, both in terms of the reliability of the unit and the quality and cost of service. Picker Evid. App., Pindyck Aff., Ex. 6, ¶¶ 18–24; Webb. Aff., Ex. 13, ¶ 20. Institutions that purchase CT Scanners often have professional purchasing officers to assist in purchase decisions, hire outside consultants, or confer with colleagues at other medical institutions prior to choosing a Scanner. *Id.* Ex. 6, ¶ 13; Ex. 13, ¶ 8. Picker claims that manufacturers, in turn, value the expected return from servicing when establishing the sales cost of their equipment, seeking to maximize their profits on both sales and service within a competitive market. *Id.* Picker Evid.App., Ex. 6, ¶¶ 21–23; Ex. 13, ¶¶ 23–25. As explained *infra,* Imaging denies that purchasers can or do analyze life cycle costs before buying a CT Scanner. *See, e.g.,* Mem. Opp'n at 26; Affidavit of Dr. William Witt ("Witt Aff."), Imaging's Appendix of Exhibits ("Imaging App."), Ex. 2; Affidavit of Dr. Joseph Morasco ("Morasco Aff."), Imaging App. Ex. 3.

On April 11, 1983, Leavitt began his employment as a service engineer with Picker. In this capacity, he serviced Picker CT Scanners and ultrasound equipment in Massachusetts and throughout New England. As a result of his training and work experience, Leavitt acquired confidential technical infor-

mation relating to the installation, maintenance, and repair of Picker's equipment. Picker's Amended Complaint ("Am.Compl.") ¶¶ 9–10, 16–18. In connection with his employment, Leavitt entered into an Employee Invention and Confidential Information Agreement with Picker, agreeing not to disclose, during or after his employment, any secret or confidential Picker business information. *Id.* ¶¶ 10–11. In addition, Leavitt agreed that he would not, for a period of one year following the termination of his employment, service Picker equipment at any location which he had serviced while working for Picker. *Id.* ¶¶ 11–13.

In November 1986 Leavitt, while still a Picker employee, was solicited by Quinn to join Imaging. *Id.* ¶ 19. Imaging was aware of Leavitt's contracts with Picker. *Id.* ¶ 20. On April 3, 1987, Leavitt resigned his employment with Picker and began working for Imaging as a CT Scanner service engineer. *Id.* ¶ 21.

Picker contends that prior to his departure from Picker, and at the request of Imaging, Leavitt took confidential business information, including service training manuals, customer information, pricing information, and diagnostic software from Picker. *Id.* ¶ 22. Picker also charges that Leavitt and Imaging have since used this information to bid on service contracts for CT Scanners in direct competition with Picker. *Id.* In addition, Picker alleges that Leavitt, on behalf of Imaging, violated his agreement not to service, for a year after his departure, Picker equipment on which he had previously worked. *Id.* ¶¶ 25–26. Picker also asserts that Imaging has engaged in a scheme of wrongful conduct, including improperly obtaining confidential and copyrighted Picker service and repair documentation, from Picker employees and from Picker's client hospitals. *Id.* ¶¶ 29–33.

On November 19, 1987, Picker filed suit against Imaging and Leavitt based on Leavitt's alleged breach of his covenant not to compete and on his purported misappropriation of Picker's confidential business information. Pursuant to a stipulation of the parties, the court issued a Partial Final Injunction prohibiting Imaging from using certain documents Leavitt retained after he left Picker, without prejudice to the defendants' right to continue to contend that those documents did not contain Picker trade secrets. February 13, 1989 Partial Final Injunction.

In the course of discovery, Picker uncovered information suggesting to it that Imaging had unlawfully acquired, and was unlawfully using, Picker's proprietary service documents and diagnostic software. Consequently, in September 1988, Picker moved to amend its complaint to add claims based on the alleged misappropriation of intellectual property. That motion was allowed on August 1, 1989, 128 F.R.D. 3.

In September, 1989, almost two years after the commencement of this suit, Imaging filed the counterclaims which are the subject of this decision. Imaging alleges that Picker adopted a plan to destroy competition without any business justification, and that Picker obtained monopoly power in the relevant market. Imaging's Answer to Amended Complaint and Counterclaim ("Countercl.") ¶¶ 9–11. More specifically, Imaging counterclaimed against Picker, alleging that: (1) Picker is a monopolist under the Sherman Act, 15 U.S.C. § 2, in a purported market consisting of the servicing of Picker CT Scanners; (2) Picker has attempted to monopolize that market in violation of 15 U.S.C. § 2; (3) Picker violated 15 U.S.C. § 1 by making agreements in restraint of trade with manufacturers of component parts; (4) Picker interfered with Imaging's contractual relations; (5) Picker interfered with Imaging's advantageous relations with customers in the market; (6) Picker disparaged and defamed Imaging to customers and potential customers in the market; and (7) Picker engaged in unfair or deceptive acts or practices in violation of Mass.Gen.L. ch. 93A.[1] Countercl. ¶¶ 21–34, 43–58. Picker seeks summary judgment on each of these claims.

Imaging also requests a declaratory judgment that it has not violated Picker's copy-

---

1. At the October 14, 1993 hearing on this motion for summary judgment, Imaging withdrew its Robinson–Patman Act claim of discriminatory pricing, *Picker v. Leavitt*, No. 87–2828, Summary Judgment Hearing, Transcript at 10 (Oct. 14, 1993) ("October 14, 1993 Tr.").

rights or misappropriated its trade secrets. *Id.* at ¶¶ 35–42. Because these declaratory judgment counterclaims merely mirror the claims Picker asserts against Imaging in its Amended Complaint, Picker agrees that their resolution must await the impending trial of its claims.

In responding to Picker's motion for summary judgment, Imaging attempted for the first time to assert a claim of illegal tying in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. At the October 14, 1993 hearing on this motion, the court informed the parties that it agreed with Picker's contention that it would be inappropriate to permit Imaging to, in effect, amend its counterclaims to assert this claim at this late date.

More specifically, Imaging raised its claim of illegal tying six years after it knew of the events at issue; four years after its original counterclaim, itself filed two years after the inception of this case; three years after the close of discovery; and in a transparent effort to evade the consequences of Picker's formidable motion for summary judgment. In these circumstances, it was clear that Picker would be unfairly prejudiced by the belated introduction of yet another claim, which would require additional discovery, and which could and should have been asserted earlier. Thus, the court informed the parties that to the extent Imaging was implicitly seeking to amend its Counterclaim to assert an illegal tying claim, the request was denied. *See* October 14, 1993, Tr. at 7–8; *Kennedy v. Josephthal, Inc.*, 814 F.2d 798, 806 (1st Cir.1987) (upholding district court's denial of leave to amend where summary judgment was under advisement and allowing amendment would have required, among other things, reopening discovery); *Quaker State Oil Refining Corp. v. Garrity*, 884 F.2d 1510, 1517 (1st Cir.1989) (affirming denial of motion to amend filed two months prior to end of discovery and three weeks prior to deadline for summary judgment motion); *Serrano Medina v. United States*, 709 F.2d 104, 106 (1st Cir.1983) (trial court did not abuse discretion in denying leave to amend where there was no justification for delay in asserting new claims, and their acceptance would require additional research and discov-

ery); *Tiernan v. Blythe Eastman Dillon & Co.*, 719 F.2d 1, 4 (1st Cir.1983) (two year delay in filing motion to amend shifts burden to movant to show "valid reason for neglect and delay").

Accordingly, the court will not consider any claim of Imaging alleging tying in violation of Section 1 of the Sherman Act.

Additional relevant facts are discussed in the following analysis of Picker's meritorious motion for summary judgment.

## II. *Analysis*

### A. *The Summary Judgment Standard.*

In considering a motion for summary judgment, the court is governed by Rule 56 of the Federal Rules of Civil Procedure, which provides in pertinent part that summary judgment may be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In making this inquiry, "the court must look at the record in the light most favorable to the party opposing the motion and must indulge all inferences favorable to that party." *Stepanischen v. Merchants Despatch Trans. Corp.*, 722 F.2d 922, 928 (1st Cir.1983); *United States v. One Parcel of Real Property*, 960 F.2d 200, 204 (1st Cir.1992); *Attallah v. United States*, 955 F.2d 776, 779 (1st Cir. 1992); *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990).

In weighing the merits of a motion for summary judgment, the court must address two questions: (1) whether the factual disputes are genuine, and (2) whether a fact genuinely in dispute is material. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law properly preclude the entry of summary judgment." *Id.* In order to determine if a dispute about a material fact is "genuine," the court must decide whether "the evidence

is such that a reasonable [fact-finder] could return a verdict for the nonmoving party." *Id.; Medina–Munoz*, 896 F.2d at 8; *Oliver v. Digital Equipment Corp.*, 846 F.2d 103, 105 (1st Cir.1988).

### B. The Sherman Act Claims

As set forth below, on the basis of the record, a reasonable factfinder could conclude that a single product market existed for the service of Picker CT Scanners. However, a reasonable factfinder could not determine from the evidence presented that Picker engaged in any exclusionary conduct. Accordingly, summary judgment must be allowed on Imaging's Sherman Act § 2 monopolization and attempted monopolization claims.

With respect to the Sherman Act § 1 counterclaims, Picker is entitled to summary judgment because a factfinder could not properly conclude that the alleged restraints of trade were unreasonable.

### 1. Monopolization and Attempted Monopolization under the Sherman Act § 2

#### a. The legal standard

Imaging alleges that through various acts of exclusionary conduct, Picker attempted to monopolize, and did monopolize, the service market for Picker CT Scanners, in violation of § 2 of the Sherman Act, 15 U.S.C. § 2.[2]

■ In analyzing a Section 2 claim, it is essential to: (1) define the relevant market; (2) determine whether the party charged has attempted to obtain, or obtained, monopoly power in that market; and, if so, (3) determine whether such power was sought or acquired by "exclusionary conduct." *Eastman Kodak Co. v. Image Technical Service, Inc.*, — U.S. —, —, 112 S.Ct. 2072, 2089, 119 L.Ed.2d 265 (1992); *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966); *Town of Concord v. Boston Edison Co.*, 915 F.2d 17, 21 (1st Cir.1990), *cert. denied*, 499 U.S. 931, 111 S.Ct. 1337, 113 L.Ed.2d 268 and *reh'g denied*, 500 U.S. 930, 111 S.Ct. 2047, 114 L.Ed.2d 131 (1991).

More specifically, to prove actual monopolization, Imaging must establish that Picker has monopoly power in the relevant market and "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Grinnell*, 384 U.S. at 570–71, 86 S.Ct. at 1703–04.

■ As for attempted monopolization, the Court of Appeals for the First Circuit has stated that:

> To succeed in an attempted monopolization claim under section 2 of the Sherman Act, the plaintiff must prove that the defendant had the specific intent to monopolize the relevant market, and a dangerous probability of success. As other courts have noted, a specific intent to monopolize or restrain competition can often be inferred from a finding of bad faith.

*CVD, Inc. v. Raytheon Co.*, 769 F.2d 842 (1st Cir.1985), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1198, 89 L.Ed.2d 312 (1986); *see also H.L. Hayden Co. of N.Y. v. Siemens Medical Systems*, 879 F.2d 1005 (2d Cir.1989) (setting forth identical elements). A showing of exclusionary conduct is required for an attempted monopolization claim. *Spectrum Sports, Inc. v. McQuillan*, — U.S. —, — – —, 113 S.Ct. 884, 890–91, 122 L.Ed.2d 247 (1993) (it is "generally required that to demonstrate attempted monopolization" plaintiff must prove that defendant "engaged in predatory or anticompetitive conduct"); *Clamp–All Corp. v. Cast Iron Soil Pipe Institute*, 851 F.2d 478, 491 (1st Cir. 1988), *cert. denied*, 488 U.S. 1007, 109 S.Ct. 789, 102 L.Ed.2d 780 (1989).

#### b. There is a genuine dispute concerning the relevant market

Imaging contends that the relevant market is service for Picker CT Scanners, and that Picker has sought and achieved monopoly power in that market. In contrast, Picker asserts that the relevant market should be defined as the sale and service of all brands of CT Scanners, and that it has not attempt-

---

**2.** Section 2 of the Sherman Act makes it illegal to "monopolize, or attempt to monopolize ... any part of the trade or commerce among the several States...."

ed to achieve or acquired monopoly power in that highly competitive market. The evidence places the question of the proper definition of the relevant market in genuine dispute. This is, therefore, an issue which would have to be tried if it were material to the determination of Imaging's Section § 2 counterclaims.

█ "To define a market, one must decide the geographic dimension, the product dimension ... and the production dimension...." 2 Philip Areeda and Donald Turner, *Antitrust Law* § 517 (1978). In this case, it is undisputed that the relevant geographic market is the United States, Countercl. ¶ 7, and the production dimension is not implicated. Thus, market definition must focus on the product dimension; that is, the "commodities reasonably interchangeable by consumers for the same purposes." *United States v. E.I. du Pont de Nemours, & Co.,* 351 U.S. 377, 395, 400, 76 S.Ct. 994, 1007, 1009, 100 L.Ed. 1264 (1956). This focus is appropriate because the ultimate question concerning market definition is whether a hypothetical cartel could raise prices significantly above the competitive level. Areeda & Turner, *supra,* § 518.1b (1993 Supp.).

Picker contends that the ability of consumers to purchase its competitors' CT Scanners if Picker charges too much to service its own product makes it improper to limit the relevant market solely to the servicing of its CT Scanners. With regard to an argument of this nature, the Supreme Court has explained that: "The extent to which one market prevents exploitation of another market depends on the extent to which consumers will change their consumption of one product in response to a price change in another, *i.e.,* the cross elasticity of demand." *Kodak,* —— U.S. at ——, 112 S.Ct. at 2038. This is a question of fact. *Lee v. Life Insurance Co. of North America,* 23 F.3d 14, 16 (1st Cir. 1994).

Picker relies on the affidavit of its expert, Professor Robert S. Pindyck, for its claim that, as sophisticated consumers who want to minimize the "downtime" of their equipment, purchasers of CT Scanners consider the cost and quality of service in deciding which brand to buy. *See* Pindyck Aff., Picker Evid.

App. Ex. 6, ¶¶ 13–14, 18–19. Pindyck bases his opinion primarily on discussions with Picker, interviews with hospital administrators, and a telephone survey of end-users. *Id.* ¶ 20–24. He believes interbrand competition acts as a restraint on the price of servicing as well as on the purchase price of CT Scanners. *Id.* at ¶ 30. In Professor Pindyk's view, the relevant market includes all producers who sell and service CT Scanners. *Id.* at 31. As Picker has never had more than 19% of this market, he asserts it lacks the monopoly power necessary to be found to have violated Section 2 of the Sherman Act.

If, as Professor Pindyck opines, the service market price is to have an impact on equipment demand, "consumers must inform themselves of the total cost of the 'package'—equipment, service, and parts—at the time of purchase; that is, consumers must engage in accurate life cycle pricing." *Kodak,* —— U.S. at ——, 112 S.Ct. at 2085 (footnote omitted). This is an information intensive analysis. It is, for example, a question of fact whether Picker or its competition makes available the information necessary for life cycle pricing. *Id.,* —— U.S. at ——, 112 S.Ct. at 2086. Moreover, defining the relevant market also requires consideration of whether there are costs of switching to another product which lock-in a purchaser and make it vulnerable to supracompetitive price increases for service because it cannot, cost-effectively in view of its investment, switch to a competing brand if service becomes more expensive. *Id.,* —— U.S. at ——, 112 S.Ct. at 2087.

Imaging offers the affidavits of Dr. William Witt to put the foregoing issues in dispute. Dr. Witt states that he participated in purchasing more than fifty Picker CT Scanners for the Veterans Administration Medical Center in Nashville, Tennessee. Witt Aff., Imaging App., Ex. 3, ¶ 2. Neither he nor anyone at the Veterans Administration engaged in life-cycle pricing in connection with those acquisitions. *Id.* No representation was made to him by Picker or any other vendor concerning life-cycle costs or comparative CT Scanner costs. *Id.* ¶¶ 2, 8. In Dr. Witt's opinion, it would be difficult for anyone to engage in an accurate life-cycle cost

analysis of CT Scanners because there are too many imponderables. *Id.* ¶ 3.

Similarly, Dr. Morasco asserts that as Chairman of Diagnostic Radiology at St. Francis General Hospital in Pittsburgh, Pennsylvania he has received market presentations from many producers of CT scanners over fifteen years, and has purchased Picker CT Scanners. Morasco Aff., Imaging App., Ex. 3, ¶ 5. He claims he has never heard the term "life-cycle costs" used by a CT Scanner manufacturer. *Id.* at ¶ 6. More significantly, he agrees with Dr. Witt that, because service requirements are uncertain, there is no way to project life-cycle service costs reliably at the time a CT Scanner is purchased. *Id.* ¶ 7. In addition, Imaging argues that Picker's survey is flawed in focusing exclusively on hospitals, which represent only a segment of consumers. *See* Mem. Opp'n at 35–36; October 14, 1993 Tr. at 24–25; Pindyck Aff., Picker Evid.App. Ex. 6, ¶ 12 ("The buyers of CT Scanners are *largely* hospitals and medical clinics.") (emphasis added).

Picker challenges the evidence of Drs. Witt and Morasco. It claims that they are biased. Witt has sued Picker previously, Picker's Supplemental Appendix of Evidentiary Materials ("Supp.App."), Ex. 4 ¶ 2, and Morasco is a shareholder of Imaging. Supp.App. Ex. 3 at 16–17. Picker also attacks the credibility of their contentions in other ways. Supp. App., Ex. 4, ¶ 2; Ex. 3 at 35–36.

At this point, however, the court must look at the record in the light most favorable to Imaging. Accepting Imaging's experts evidence as credible for present purposes, it is sufficient to create a disputed fact concerning whether purchasers of CT Scanners can and do engage in life-cycle pricing. This is particularly true in view of the fact that Picker's main evidence on this point, Professor Pindyck's report, focuses exclusively on the class

of purchasers best able to gather and process information, and ignores smaller or individual purchasers. A jury could reasonably infer on this record that smaller purchasers are less able or likely than large, institutional purchasers such as hospitals to engage in life-cycle pricing analysis. There is, therefore, a genuine dispute concerning whether the market should be defined as the sale and service of all CT Scanners, or the service of Picker's product alone.

It is undisputed that if the relevant market is the service of Picker's products, Picker's share is 70 to 80%. This is within a range which would permit a reasonable factfinder to conclude that Picker had monopoly power in that market. *See Kodak,* —— U.S. at ——, 112 S.Ct. at 2090 (80–95% of service market with no readily available substitute is sufficient showing); *Grinnell,* 384 U.S. at 571, 86 S.Ct. at 1704 (87% of market constitutes monopoly).

Accordingly, the issue of market definition would have to be tried if it were material to the outcome of this case. However, as there is inadequate evidence that Picker engaged in exclusionary conduct, the question of market definition is not material to the disposition of Picker's motion for summary judgment.[3]

c. *There is inadequate evidence for a factfinder to conclude Picker engaged in exclusionary conduct*

 Picker is entitled to summary judgment on the Sherman Act § 2 claims because Imaging has not offered sufficient evidence to prove that any monopoly power Picker may possess arose as a result of "the willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of a superior prod-

---

**3.** The court notes that claims similar to those alleged by Imaging were made against Picker by another ISO in *Electronics in Medicine, Inc. v. Picker Int'l, Inc.,* C.A. No. H–88–1400 (S.D.Tex. Nov. 8, 1991). On a motion for summary judgment by Picker, the court found that a jury could reasonably find a single brand market with respect to the service of Picker CT Scanners, and that Picker had used its unique position as manufacturer in order to eliminate competition at the service market level. Picker's Appendix of Au-

thorities, ("Auth.App."), Ex. 3 at 7. Therefore, the court denied the motion for summary judgment. *Id.* at 7–8. The jury, however, ultimately found that no single brand market for the service of Picker CT Scanners existed. Imaging's Appendix of Exhibits ("Imaging App."), Ex. 20 at 1. Picker, therefore, prevailed on plaintiff's antitrust claims, although not on its claims of tortious interference with advantageous relationships.

uct, business acumen, or historic accident." *Grinnell,* 384 U.S. at 570–71, 86 S.Ct. at 1703–04; *see also Kodak,* —— U.S. at ——, 112 S.Ct. at 2089. The Court of Appeals for the First Circuit has characterized the willful acquisition or maintenance of monopoly power as "exclusionary conduct." *Barry Wright Corp. v. ITT Grinnell Corp.,* 724 F.2d 227, 230 (1st Cir.1983); *see also Town of Concord,* 915 F.2d at 21. It has given content to the term by defining it as " 'conduct, other than competition on the merits or restraints reasonably 'necessary' to competition on the merits, that reasonably appears capable of making a significant contribution to creating or maintaining monopoly power.' " *Barry Wright,* 724 F.2d at 230 (quoting 3 Areeda and Turner, *supra,* ¶ 626 at 83). A practice is "anticompetitive" if it harms the competitive process, not if it merely harms competitors. *Town of Concord,* 915 F.2d at 21; *R.W. International Corp. v. Welch Food, Inc.,* 13 F.3d 478, 487 (1st Cir.1994). This process is harmed when the conduct at issue "obstructs the achievement of competition's basic goals—lower prices, better products, and more efficient production methods." 915 F.2d at 22.

Thus, the question is whether Picker's "conduct [was] reasonable in light of its business needs or did it unreasonably restrict competition?" *Barry Wright,* 724 F.2d at 230; *see also Town of Concord,* 915 F.2d at 21 (in making exclusionary conduct analysis, court compares challenged practice's likely anticompetitive effects with its potentially legitimate business justifications).

Imaging asserts in its counterclaim that Picker has engaged in seven types of exclusionary conduct: lockout specifications in Veterans Administration Hospital contracts for the service of Picker CT Scanners; defamation; unlawful refusals to deal; sham litigation; unauthorized removal of documents from customer sites; predatory pricing; and sabotage. As explained below, the evidence on these claims, individually and cumulatively, is insufficient to create a litigable issue concerning exclusionary conduct. Thus, Imaging is not entitled to a trial on its monopolization or attempted monopolization claims.

(a) *The Veterans Administration's "Lockout Specifications"*

Imaging's strongest evidence of alleged exclusionary conduct relates to certain Veterans Administration ("VA") specifications for the servicing of Picker CT Scanners which the Department of Veterans Affairs subsequently found improperly restricted the ability of ISO's to compete for Veterans Administration service contracts. Department of Veterans Affairs, Office of the Inspector General, Special Review of VA's Service Contracts for the Picker CT Scanner, September 30, 1991, Ex. A to Ex. 1 of Imaging App. ("the Report"). The Department of Veterans Affairs, however, did not look for or find any irregular contracting practices on the part of Picker. Department of Veterans Affairs, Office of the Inspector General, Special Review of VA's Service Contracts for the Picker CT Scanner (Amended), September 30, 1991, Supp.App. Ex. 1 at i ("the Amended Report"). Rather, the Department of Veterans Affairs specifically noted that, "Picker's contracting practices are the subject of ongoing litigation between Picker and certain independent service organizations," *id.,* and implicitly left open for determination in this case the question whether Picker improperly caused the Veterans Administration to adopt the restrictive specifications.

Examination of the evidence indicates that a reasonable factfinder could conclude that Picker improperly caused the Veteran's Administration to adopt only one restrictive specification, regarding one contract. Such conduct is insufficient, both alone and in the context of all the other relevant evidence, to create a triable issue of whether Picker used exclusionary conduct to seek or acquire any monopoly power it might be found at trial to have concerning the servicing of all of its CT Scanners.

More specifically, the Department of Veterans Affairs issued, then amended, reports addressing allegations that the Veterans Administration had unnecessarily included in its specifications for the servicing of Picker CT Scanners requirements which only Picker could meet, thus "locking out" its competitors. Those reports would be admissible at trial pursuant to Fed.R.Evid. 803(8)(C),

which provides for the introduction of reports of a public agency containing factual findings resulting from an investigation made pursuant to law. *See Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988); *Sabel v. Mead Johnson and Co.*, 737 F.Supp. 135 (D.Mass.1990). The statements in those reports attributed to Picker would also be admissible because, as statements by a representative of Picker, they would not, pursuant to Fed.R.Evid. 801(d)(2)(c), be hearsay. *See United States v. De Peri*, 778 F.2d 963, 977 (3rd Cir.1985), *cert. denied sub nom., Murphy v. United States*, 475 U.S. 1110, 106 S.Ct. 1518, 89 L.Ed.2d 916 (1986) (out-of-court statements contained in public records require a separate hearsay exception before they can be admitted). The Report and Amended Report found that the Veterans Administration specifications in twenty-one of thirty-six contacts for the servicing of Picker CT Scanners improperly favored Picker in at least one of three ways. First, nine contracts required the use of the Mega H or Mega HD x-ray tubes produced by Picker's Dunlee division (the "Dunlee tube"). Report at 4. As described *infra*, Picker would not sell the Dunlee tube to ISOs. ISOs, however, could buy the EIMAC tube, produced by Varian Corporation, which the Report found to be an acceptable substitute for the Dunlee tube. *Id.* The Report cited direct evidence that, in one instance, Picker sought to influence the Veterans Administration to adopt the restrictive requirement concerning the Dunlee tube by writing, "in a letter dated November 12, 1986, to VAMC Indianapolis, indicat[ing] only Dunlee tubes are safe because the EIMAC tube introduced the potential for damage to the scanner and possible injury to the patient." *Id.* The Report found that in over half of the thirty-six contracts, including some which did not expressly require use of the Dunlee tube, ISOs were eliminated from

receiving the award because they did not have access to the Dunlee tube. *Id.*[4]

The Report also found that ten Veterans Administration service contracts required that service technicians be trained by Picker. *Id.* at 5. Once again, only Picker could meet this requirement. The Report found, however, that the Veterans Administration could adequately train its in-house technicians to service Picker CT Scanners. *Id.* Therefore, it concluded that this specification, which excluded ISOs from receiving awards, was overly restrictive.[5] *Id.* There is no evidence, however, that Picker made any misrepresentation which resulted in the Veterans Administration adopting this requirement.

The Report also found that thirteen contracts unnecessarily required that the servicing organization use Picker diagnostic and operational software. *Id.* As Picker did not license its software to ISOs, this specification eliminated ISOs from consideration for certain awards. Once again, however, there is no evidence that Picker improperly influenced the Veterans Administration to adopt this requirement.

In 1991, the Report recommended that the Veterans Administration develop unrestrictive specifications for all service contracts for Picker CT Scanners. There is no evidence suggesting that this has not been done.

The court has carefully considered the evidence concerning Picker's conduct with regard to the Veteran's Administration and concludes that it is not sufficient, alone or in conjunction with Imaging's other evidence, to create a litigable issue concerning whether Picker engaged in exclusionary conduct in the market for servicing all of its CT Scanners.

The Veterans Administration is only one customer for the Picker CT Scanner. It comprises some unspecified fraction of the

---

4. There is no direct evidence that Imaging lost a VA award because it lacked access to the Dunlee tube. This fact, however, relates only to Imaging's potential damages and not to whether Picker violated Section 2—a question which focuses on injury to competition rather than to a specific competitor. *See, e.g., Town of Concord*, 915 F.2d at 21.

5. Imaging lost a Veterans Administration contract in Los Angeles, California because its representatives were not trained by Picker. VA Memorandum on Technical Evaluation of Imaging Equipment Services, Imaging App., Ex. B to Ex. 1; Quinn Aff.; Imaging App., Ex. 1, ¶¶ 13–14.

total market of Picker CT Scanners which must be serviced.

■ "[E]fforts to influence government officials acting under statutes requiring competitive bidding are within the scope of the antitrust laws." *Whitten v. Paddock Pool Builders, Inc.*, 424 F.2d 25, 34 (1st Cir.), *cert. denied*, 400 U.S. 850, 91 S.Ct. 54, 27 L.Ed.2d 88 (1970) and 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975). It is, however, not improper for a producer to engage in an honest effort to persuade a government agency that specifications favoring it are appropriate. However, "efforts of any industry leader to impose his product specifications by guile, falsity, or threats are contrary to [the antitrust] laws." *Id.* at 31; *see also* 3 Areeda and Turner, *supra*, § 738b at 280 ("Although the fact of influence or inducement cannot itself be wrongful, its manner can be improper.").

In this case, Picker was dealing with sophisticated purchasers, the many different procuring offices of the Veterans Administration. There is no evidence that Picker bribed or otherwise corrupted any Veterans Administration official. Nor is there any evidence of threats. The essence of Imaging's allegations is that Picker misled the purchasers.

After many years of discovery, except for the letter quoted in the Report concerning the EIMAC tube, there is no direct evidence regarding what Picker communicated to the various Veterans Administration procurement offices prior to their adopting what the Report found to be unnecessarily restrictive specifications. Although circumstantial evidence may be considered, it is axiomatic that in the absence of admissible evidence a jury would not be permitted to speculate or guess what Picker might have communicated to the Veterans Administration prior to the issuance of those specifications.

Picker's 1986 letter relating to one proposed contract, and stating that the EIMAC tube was not a suitable substitute for its Dunlee tube, was false. Indeed, as discussed *infra*, Picker now relies on the suitability of the EIMAC tube to defend against another form of alleged exclusionary conduct, its purportedly unlawful refusal to sell the Dunlee tube to ISOs. As Professor Areeda and Turner have written, however:

Many buyers ... recognize disparagement [of a rival] as non-objective and highly biased. Although hardly a justification for falsehood, buyer distrust of a seller's disparaging comments about a rival seller should caution us against attaching much weight to isolated examples of disparagement. Essential, therefore, is a serious de minimis test. We would go further and suggest such claims should be presumptively ignored.

3 Areeda and Turner, *supra*, § 738c at 281.

In this case, the evidence depicts only a single instance of a false statement made to a sophisticated and presumably skeptical, independent purchaser. There is no evidence that Imaging and other ISOs did not have the opportunity to neutralize Picker's misstatement before the specification was issued. In any event, the Report recommending abandonment of the restrictive specifications was evidently a response to communications from ISOs to the Department of Veterans Affairs.

In these circumstances, the evidence is insufficient for a reasonable factfinder to conclude that Picker's conduct concerning the Veterans Administration "made a significant contribution to creating or maintaining monopoly power," *Barry Wright*, 724 F.2d at 230, in the market for servicing all Picker CT Scanners, of which those purchased by the Veterans Administration were only a fraction. *See* 3 Areeda and Turner, *supra*, § 738a at 278–79; *National Association of Pharmaceutical Manufacturers v. Ayerst Laboratories*, 850 F.2d 904, 916–17 (2d Cir. 1988) (citing Areeda and Turner in reversing the grant of motion to dismiss on basis that discovery to date was insufficient for evaluation of relevant factors under *de minimis* test); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 288 n. 41 (2d Cir.1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980) ("Before we would allow misrepresentations to buyers to be the basis of a competitor's treble damages action under § 2, we would at least require the plaintiff to overcome a presumption that the effect

on competition of such a practice was de minimis.") (citing Areeda and Turner); *Data General Corp. v. Grumman Systems Support Corp.*, 761 F.Supp. 185, 189–90 (D.Mass. 1991).

### (b) *Defamatory Statements*

■ Imaging alleges that Picker made defamatory statements to five customers which constituted, or contributed to, exclusionary conduct. There is, however, admissible evidence of one only negative statement to a customer; it was not defamatory; and it was so innocuous that it is insufficient to constitute, or contribute to a finding of, exclusionary conduct by Picker.

Contrary to Imaging's contention, there is no evidence that Picker made negative statements about Imaging to potential customers Marie Gaborko, Rudolph Buck, or Ronald Heffner. Indeed, Buck and Gaborko deny ever having communications with Picker concerning Imaging. Picker Evid.App., Affidavit of Rudolph Buck, Ex. 1, ¶¶ 3–5; Affidavit of Marie Gaborko, Ex. 4, ¶¶ 4–6.

With regard to Jacqui Scymanski, Imaging offers only hearsay evidence from Quinn that Scymanski said a Picker employee told her that Quinn and his partner had split, and Imaging did not back its warranties. Quinn Dep., Picker Evid.App., Ex. 19 at 6–69 to 6–76. Scymanski, however, denies that Picker ever said anything to her about Imaging. Affidavit of Jacqui Scymanski, Picker Evid. App., Ex. 11, ¶¶ 3–5. Scymanski's assertion is not genuinely in dispute because Quinn's inadmissible hearsay may not be considered in deciding this motion for summary judgment. *See Schwimmer v. Sony Corporation of America*, 637 F.2d 41, 45 n. 9 (2d Cir. 1980); *Wiley v. United States*, 20 F.3d 222, 225 (6th Cir.1994).

■ One customer, A.V. Papa, Jr., did testify that Picker employees made comments that: Imaging "wouldn't do a good job;" Imaging didn't have the commercial "expertise to keep the equipment up and running without downtime;" and Imaging would not be at the "beck and call" of Papa. Deposition of A.V. Papa, Jr. ("Papa Dep."), Imaging's Evid.App., Ex. 27, at 75, 78, and 82. These comments are not, however, defamatory or libelous. A communication is defamatory if it "discredits the plaintiff 'in the minds of any considerable and respectable segment in the community.'" *Draghetti v. Chmielewski*, 416 Mass. 808, 811, 812 n. 4, 626 N.E.2d 862 (1994) (quoting *Tropeano v. Atlantic Monthly Co.*, 379 Mass. 745, 751, 400 N.E.2d 847 (1980)). Generally, where the discussion involves a rival's services or product, it is not considered libelous unless it "imputes to the corporation fraud, deceit, dishonesty, or reprehensible conduct...." *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 924 (3rd Cir.), *cert. denied sub nom., Independence Blue Cross v. U.S. Healthcare, Inc.*, 498 U.S. 816, 111 S.Ct. 58, 112 L.Ed.2d 33 (1990). The statements reportedly made to Papa do not meet either of these standards.

■ Looking at the record in the light most favorable to Imaging, the comments which Papa attributes to Picker constitute at most commercial disparagement. Commercial disparagement is defined by the *Restatement (Second) of Torts*, § 623A (1979), as a false statement intended to bring into question the quality of a rival's goods or services in order to inflict pecuniary harm. *See also DeCosta v. Viacom International, Inc.*, 981 F.2d 602, 610 (1st Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 3039, 125 L.Ed.2d 725 (1993). Statements constituting commercial disparagement are generally regarded as conditionally privileged. *See Restatement (Second) of Torts* § 649 (1979). This is because, as described earlier, "[m]any buyers ... recognize disparagement [of a rival] as non-objective and highly biased." 3 Areeda and Turner, *supra*, § 738c at 281; *see also R.W. Sims v. Mack Truck Corp.*, 488 F.Supp. 592, 605 (E.D.Pa.1980), *cert. denied,* 445 U.S. 930, 100 S.Ct. 1319, 63 L.Ed.2d 764 (1980). Indeed, in this case, Papa testified that none of Picker's statements caused him to change his mind about using Imaging. Papa Dep., Imaging's Evid.App., Ex. 27 at 79.

In these circumstances, Imaging's claim of defamation does not have sufficient substance to constitute, or contribute to a finding of, exclusionary conduct. *See Data General Corp. v. Grumman Systems Support Corp.*, 761 F.Supp. 185, 189 (D.Mass.1991);

*Falstaff Brewing Co. v. Stroh Brewery Co.,* 628 F.Supp. 822, 831 (N.D.Cal.1986).

### (c) *Unlawful Refusal to Deal*

Imaging contends that Picker's refusal to sell ISOs the Dunlee tube used in its CT Scanner constitutes exclusionary conduct. However, because the EIMAC tube is a suitable and available substitute for the Dunlee tube, Picker's consistent refusal to sell it to ISOs was permissible, rather than exclusionary, conduct. A monopolist may not refuse to make an "essential facility" available to a competitor. *Otter Tail Power Co. v. United States,* 410 U.S. 366, 377–78, 93 S.Ct. 1022, 1029–30, 35 L.Ed.2d 359 (1973); *MCI Communications Corp. v. American Tel. & Tel. Co.,* 708 F.2d 1081, 1132 (7th Cir.), *cert. denied,* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983). Nor may a monopolist reverse a well-established practice of dealing with a competitor if the change in policy injures competition, and there is no legitimate business reason for the change. *Aspen Skiing Co. v. Aspen Highland Skiing Corporation,* 472 U.S. 585, 605–08, 105 S.Ct. 2847, 2858–61, 86 L.Ed.2d 467 (1985).

The Dunlee tube is a key component of Picker CT Scanners. Picker Evid.App., Ex. 13, ¶ 30. Picker sold the Dunlee tube to end-users, regardless of whether they contracted with Picker for servicing. *Id.* at ¶ 32(a). Claiming that it did not want to be blamed if faulty installation caused a problem, however, Picker would not sell the Dunlee tube to ISOs. *Id.* at 56. ISOs, however, had ready access to the EIMAC tube which, as described earlier, the Department of Veterans Affairs found is a fully acceptable substitute for the Dunlee tube. *Id.* at ¶ 34. The parties do not dispute this fact.

Accordingly, the Dunlee tube was not an "essential facility" for the servicing of Picker CT Scanners. There is evidence that Picker may have inadvertently sold one Dunlee tube to Imaging. *Id.* at ¶ 33; Ex. 19 at 5–26 to 5–27. This does not, however, place in genuine dispute the fact that Picker had a consistent policy and practice of not selling the Dunlee tube to ISOs. In these circumstances, Picker's conduct concerning its Dunlee tube could not be found to be an unlawful refusal to deal.

### (d) *Sham Litigation*

Imaging alleges Picker initiated unfounded litigation to injure competition for the servicing of its CT Scanners. This allegation is unsupported.

In the antitrust context, litigation may constitute, or contribute to a finding of, illegal conduct if: (1) "the lawsuit is objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits;" and (2) the motive for the baseless lawsuit was " 'an attempt to interfere directly with the business relationships of a competitor.' " *Professional Real Estate Investors, Inc. v. Columbia Pictures, Inc.,* —— U.S. ——, ——, 113 S.Ct. 1920, 1928, 123 L.Ed.2d 611 (1993) (quoting *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 144, 81 S.Ct. 523, 533, 5 L.Ed.2d 464 (1961)). With regard to the second prong of this test, Imaging does not place in genuine dispute Picker's assertion that it has initiated all litigation in good faith. Picker Statement of Undisputed Facts ¶ 39. In support of its claim of sham litigation, Imaging merely refers the court to certain exhibits, without focused citations, explanation, or argument. Imaging App., Ex. 2, Witt Aff. ¶ 2; Imaging App., Ex. 23, ETEK Verdict; Imaging App., Ex. 27, Papa Dep. at 51–52. Having examined these materials, the court finds that they fail to place in dispute Picker's good faith in instituting any suit or alleging claims in this or any case on which Imaging relies.

Nor is the evidence adequate to place in genuine dispute whether Picker's claims in various cases had an objectively reasonable basis. There was plainly an objectively reasonable basis for Picker to institute the instant case. Imaging consented to a Partial Final Injunction restricting it from possessing items of Picker documents retained by Leavitt when he left Picker, although without prejudice to Imaging's right to contend that those documents did not contain trade secrets. *See* February 13, 1989 Partial Final Injunction. More significantly, Imaging has not sought summary judgment on Picker's claims because there are clearly material

facts genuinely placed in dispute by the evidence Picker has offered.

The information furnished to the court indicates that Picker settled two other cases on a basis Picker regards as favorable. *Picker International, Inc. v. Robert Fiorino,* C.A. No. 144682 (C.P. Cuyahoga County Ohio) and *Picker International, Inc. v. R–Squared, Inc.,* C.A. No. C518629 (L.A.Super.Ct.Cal.). Picker prevailed at trial in a third case on which Imaging relies and which Picker did not even initiate. *See* Picker Auth.App., Ex. 7, *Witt v. Picker International, Inc.,* No. 3–88–0836 (D.Tenn. Feb. 14, 1989).

Picker did lose one case it initiated in which it was found that a covenant not to compete executed by a former employee of Picker was unenforceable. *See* Picker Auth. App., Ex. 4., *Picker Int'l, Inc. v. Radological Imaging Services of Pa, Inc.,* C.A. No. 87–01282, slip op. at 1–2 (C.P. Lebanon County Pa. September 29, 1987). There is no evidence to prove, however, that it was objectively unreasonable for Picker to have instituted that action.

Accordingly, the evidence is insufficient to prove Imaging's claim that Picker initiated "sham" litigation as a form or exclusionary conduct.

### (e) *Unauthorized Removal of Documents*

 Imaging has also introduced no evidence to support its claim that Picker improperly removed its service documentation from customer sites in order to unlawfully frustrate competition. Picker contends that it retrieved its service documentation and materials from customer sites in order to prevent third parties, including customers, from using them and "free-riding" on the capital investment made by Picker. Picker Evid.App., Ex. 13, ¶ 29. In the instances of claimed misconduct alleged by Imaging, Picker responds that it had received permission to remove its service materials from Leonard Morse Hospital, Universal Medical Scanners, and Lewiston Hospital. Picker Evid.App., Ex. 7, ¶¶ 6–7; Ex. 15 at I–65 to I–66; Ex. 26. As Imaging concedes, Picker merely unsuccessfully attempted to remove service materials from Physicians Medical Imaging and South County Hospital. Picker Evid.App., Ex. 21 at 4–5. In these circumstances, Picker's removal of materials from customer sites does not provide a basis for a finding of exclusionary conduct.

### (f) *Predatory Pricing*

 Imaging vaguely alleges Picker engaged in "predatory pricing." Predatory pricing is the pricing of a product below its average total cost. *See Barry Wright,* 724 F.2d at 231. In connection with the motion for summary judgment, however, Imaging has not disputed Picker's assertion that it priced its service contracts for CT Scanners above total cost. Statement of Material Facts ¶ 48. Nor has Imaging argued the merits of this claim in its submissions. Thus, the allegation of predatory pricing is also unsupported.

### (g) *Sabotage*

 Imaging also alleges that Picker engaged in "sabotage." Picker, however, denies having sabotaged any of its CT Scanners which are serviced by ISOs. Statement of Material Facts ¶ 28. There is no evidence of sabotage, no first-hand witness accounts of the alleged sabotage, and no complaints of sabotage by customers to either Picker or law enforcement officials. Picker Evid.App., Ex. 13, ¶ 36. In addition, each of the Picker employees alleged to have participated in the purported sabotage deny having done so. Picker Evid.App., Ex. 3, ¶¶ 4–5; Ex. 8, ¶¶ 4–5; Ex. 9, ¶¶ 4–7. Imaging's submissions do not address Picker's denial of sabotage, let alone provide evidence to place this claim of sabotage genuinely in dispute. This claim, therefore, contributes nothing to Imaging's evidence concerning exclusionary conduct.

\* \* \*

In view of the foregoing, Imaging has failed to offer evidence which, individually or cumulatively, is sufficient to put in genuine dispute its claim that Picker engaged in exclusionary conduct. Therefore, Picker's motion for summary judgment on Imaging's attempted monopolization and monopolization claims must be allowed.

2. *Agreements in Restraint of Trade in Violation of Sherman Act § 1*

■ Imaging also contends that Picker's agreements requiring that some, but not all, manufacturers of components of its CT Scanners sell them exclusively to Picker violates § 1 of the Sherman Act, which prohibits contracts "in restraint of trade or commerce." As set forth below, however, § 1 has been interpreted to apply only to "unreasonable" restraints of trade. The evidence does not place in genuine dispute Picker's assertion that there are valid reasons for the contracts at issue. Thus, there is not a triable issue concerning Imaging's Sherman Act § 1 charges.

Picker is alleged to have agreements with seventeen suppliers of components for its CT Scanners. In eight instances, those manufacturers are permitted to sell Picker CT Scanner components to end-users and ISOs, including Imaging, either directly or through distributors, or no longer produce parts for Picker. Picker Evid.App., Ex. 5, ¶¶ 3–4; Ex. 14 at I–130 to I–133, I–172 to I–174, I–184 to I–185 and I–200; Ex. 19 at 5–177 to 5–179.

Picker has agreements with nine other manufacturers, which require them to sell the Picker CT Scanner components they produce only to Picker.[6] There is no allegation that those manufacturers are restricted in their ability to produce parts for Picker's competitors. Picker will sell the components to end-users and ISO's, including Imaging. Picker Evid., App. Ex. 5, ¶ 5.

Imaging asserts, however, that Picker keeps an inadequate inventory of such components, so that ISOs cannot meet customers' needs in a timely manner. Mem. Opp'n at 11–12. Imaging also claims that Picker informed Quinn it would take twenty-six weeks to deliver one component he tried to buy. Quinn Aff., Ex. 1, at ¶ 12. In one instance, Imaging claims it lost to Picker a contract to service a new Picker CT Scanner being purchased by one of Imaging's existing customers, the St. Francis Medical Center in Pittsburgh, because of Imaging's inability to minimize downtime by delivering essential parts promptly. Imaging App., Ex. 24, Ex. 4

thereto. It is undisputed, however, that ISOs such as Imaging could maintain an inventory of critical component parts if they were willing to make the necessary investment. Imaging, in effect, contends that Picker must make that investment instead.

■ Picker's exclusive agreements with nine manufacturers of its CT Scanner components are vertical restraints of trade. They are illegal under § 1 of the Sherman Act, however, only if they are unreasonable. Justice Louis Brandeis articulated the classic formulation of the "rule of reason" test, stating:

> The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.

*Chicago Board of Trade v. United States,* 246 U.S. 231, 244, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918). In applying this test, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977). Thus, a vertical combination without a legitimate business justification which operates to the detriment of competition violates this standard. *Business Electronics v. Sharp Electronics,* 485 U.S. 717, 723, 108 S.Ct. 1515, 1518, 99 L.Ed.2d 808 (1988), *cert. denied,* 486

---

**6.** Picker, for purposes of this motion for summary judgment, has accepted as true Imaging's

claim that it entered into the alleged exclusive agreements. Picker's Mem. of Law at 46 n. 33.

U.S. 1005, 108 S.Ct. 1727, 100 L.Ed.2d 192 (1988).

For the reasons stated earlier, the court assumes for the purposes of deciding this motion for summary judgment that the relevant market is the servicing of Picker CT Scanners. There is not, however, sufficient evidence for a factfinder to conclude that Picker's exclusive agreements lacked a legitimate business justification or that they unreasonably injured competition.

Picker has invested considerable resources, ranging from $100,000 to $1,000,000 each, to develop the component parts for Picker CT Scanners which are manufactured by the nine suppliers with which it has exclusive agreements. Affidavit of Dr. Robert A. Cecil ("Cecil Aff."), Picker Evid.App., Ex. 2, ¶ 3. Picker's expenditures in developing these component parts include its labor costs for research, development, and design, and the amounts Picker paid to some component part manufacturers for research, development and retooling. *Id.* Picker states that it made these arrangements with suppliers, rather than manufacturing the components itself, because it was more cost-effective to do so. *Id.* ¶ 4. There is no evidence to place this contention in dispute.

Picker describes legitimate reasons for its exclusive arrangements. Essentially, Picker asserts that if these nine manufacturers were permitted to sell Picker CT Scanner components to ISOs and end-users, they could "free-ride" on Picker's substantial investment in research and development, and unfairly undercut the price Picker charges end-users and ISOs. *See e.g.,* Richard Posner, *Antitrust Law: An Economic Perspective* 148–150 (1976).

■■■ It has generally been recognized that vertical agreements designed to prevent free-riding do not violate § 1 of the Sherman Act because free-riding discourages capital investment and product innovation. *See Monsanto Co. v. Spray–Rite,* 465 U.S. 752, 762–63, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775 (1984); *Continental T.V.,* 433 U.S. at 55, 97 S.Ct. at 2560. Imaging, however, argues that the Supreme Court in Kodak rejected "free-riding" as a legitimate justification for a restraint of trade. *Kodak,* however, is

distinguishable from the present case. In *Kodak,* the defendant refused to sell to ISOs certain parts for its product which were not available from any other source. —— U.S. at ——, 112 S.Ct. at 2077. The ISOs alleged that Kodak's conduct constituted an actionable refusal to deal under § 2 of the Sherman Act. *Id.,* —— U.S. at ——, 112 S.Ct. at 2078. Kodak claimed, among other things, that its policy was justified by its need to prevent ISOs from free-riding on its investment in the design and development of its replacement parts. *Id.,* —— U.S. at ——, 112 S.Ct. at 2079. In reversing a grant of summary judgment for Kodak, the Court held that there was a triable issue of whether prevention of free-riding in that instance justified Kodak's refusal to deal. *Id.,* —— U.S. at ——, 112 S.Ct. at 2092.

In the instant case there is no analogous § 2 claim because Picker will sell the components at issue to end-users and ISOs, including Imaging. Picker Evid.App., Ex. 5, ¶ 5. Instead, Imaging contends that Picker's exclusive agreements with its suppliers violates § 1 by preventing ISOs from purchasing replacement parts directly from the suppliers. However, *Kodak* does not hold that a manufacturer can never enter into exclusive agreements with suppliers for whom it has provided customized specifications, developed by it at substantial cost. If this were the law, it appears that Picker would be forced to choose between manufacturing certain components itself at a higher cost and passing those additional costs on to consumers, or allowing suppliers to benefit unfairly from Picker's investment in developing the components by allowing them to sell these components at a lower cost than Picker.

In *Kodak,* the decision that the free-riding rationale did not entitle Kodak to summary judgment was based significantly on the concern that because Kodak would not sell parts to ISOs or allow its suppliers to do so, the ISOs would be compelled to enter the parts production market. —— U.S. at ——, 112 S.Ct. at 2091. Thus, the vertical restraint in *Kodak* presented "one of the evils proscribed by the antitrust laws ... the creation of entry barriers to potential competitors by requiring them to enter two markets simulta-

neously." *Id.* In contrast, in the present case, the evidence does not place in dispute the fact that Picker has a policy and practice of selling the components at issue to end-users and ISOs. Thus, Picker's exclusive agreements could not be found to create a barrier to entry in violation of § 1 of the Sherman Act.

If the evidence were sufficient to permit a reasonable factfinder to conclude that Picker did not really make the components at issue available to ISOs in a timely manner despite its stated policies, there might be a triable issue concerning whether Picker's conduct violates § 1. However, after discovery, Imaging cites only one instance in which it was told by Picker there would be a twenty-six week delay in getting a requested part, and one customer, St. Francis Medical Center, that Imaging claims to have lost to Picker because Imaging was too slow in acquiring needed components.[7] In view of the fact that Imaging and other ISOs could maintain an inventory of key components if they were willing to make the necessary investment, the isolated instances cited by Imaging are insufficient to put the existence or legitimacy of Picker's policy of selling to end-users and ISOs genuinely in dispute. *See Abcor Corp. v. AM International, Inc.,* 916 F.2d 924, 929–30 (4th Cir.1990) (parts sales policy which requires ISO to bear inventory costs is not anticompetitive under antitrust law).

Nor is there adequate evidence to support Imaging's additional claims that Picker's exclusive agreements with the manufacturers of its CT Scanner components have other anticompetitive effects. Those manufacturers are not restricted in their ability to produce components for CT Scanners which compete with Picker's. Nor is the evidence sufficient to prove that Picker charges ISOs a price for the components which is excessive in view of Picker's investment in the research and development which resulted in their design and manufacture. The exclusive agreements therefore, could not be found to be unreasonable. *See Roland Machinery Co. v. Dresser,* 749 F.2d 380, 394 (7th Cir.1984); *Tri–State Rubbish, Inc. v. Waste Manage-*

*ment, Inc.,* 998 F.2d 1073, 1080 (1st Cir. 1983). Accordingly, the evidence concerning these vertical restraints is inadequate to create a litigable issue on Imaging's Sherman Act § 1 claim. Indeed, to the extent that the exclusive agreements permit Picker to acquire components for less than it would cost Picker to manufacture them and pass that savings on to its customers, those agreements have a favorable competitive effect.

In view of the foregoing, Picker's motion for summary judgment on Imaging's Sherman Act § 1 claim must be allowed.

### C. State Law Claims

Imaging alleges several state law claims, to which it devoted little attention in opposing Picker's Motion for Summary Judgment. There is not sufficient evidence to create a litigable issue on any of those claims.

#### 1. Interference with contractual relations

In order to sustain a claim of interference with contractual relations, the plaintiff "must prove that: (1) he had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; and (3) the plaintiff was harmed by the defendant's actions." *United Truck Leasing Corp. v. Geltman,* 406 Mass. 811, 812, 551 N.E.2d 20, 21 (1990).

Imaging, however, has not offered evidence of any existing contract which was breached as a result of Picker's conduct. Therefore, summary judgment must be entered for Picker on this claim.

#### 2. Interference with advantageous relationships

Imaging has also provided no evidence that improper conduct by Picker proximately caused its loss of any identifiable service contract which Imaging had a reasonable probability of successfully obtaining. Therefore, Imaging's claim of tortious interference with advantageous relationships may not be maintained.

---

**7.** As described, *infra,* there is inadequate evidence to prove that misconduct by Picker caused

Imaging to lose the St. Francis Medical Center contract.

The elements of this business tort are that: (1) plaintiff had a business relationship or contemplated contract of economic benefit; (2) defendant knew of this relationship; (3) defendant intentionally and improperly interfered with it; and (4) plaintiff's injurious loss of advantage was a direct result of the defendant's conduct. *American Private Line Services, Inc. v. Eastern Microwave, Inc.*, 980 F.2d 33, 36 (1st Cir.1992); *Geltman*, 406 Mass. at 815, 551 N.E.2d 20.

In support of this claim, Imaging has produced a letter concerning a possible contract to service a Picker CT Scanner, with the St. Francis Medical Center, which Imaging lost to Picker. Deposition of Robert C. Clark, Imaging App., Ex. 24, Ex. 4 thereto. There is no evidence, however, that Picker won that contract improperly. The letter indicates that Imaging had a service contract for one Picker CT Scanner owned by the St. Francis Medical Center. *Id.* Picker offered to accept slightly less than Imaging to service the new Picker CT Scanner the St. Francis Medical Center was acquiring. *Id.* The committee established to recommend who should receive the award recognized the potential difficulty of having service contracts with different vendors for the two Picker CT Scanners at the same site. *Id.* Nevertheless, the committee reported that:

> The CT contract should be awarded to Picker. The Committee felt that the quality of service offered by Picker would be superior to that offered by Mr. Quinn and his company. For example, the problems regarding "down time" due to unavailability of parts, and the recent experience of substandard parts being delivered to Mr. Quinn, would be alleviated using the manufacturer as the repair agent.

*Id.* As discussed earlier, there is no evidence that Picker improperly caused any problems Imaging had in obtaining parts for the St. Francis Medical Center.[8] Similarly, there is no evidence to prove that Picker was the source of any substandard parts delivered to Imaging. Thus, the St. Francis Medical Center matter does not present a litiga-ble case of interference with advantageous relations.

Although Imaging does not make the claim expressly, the court has also considered whether the previously described loss by Imaging of the Los Angeles Veterans Administration contract as a result of the restrictive specifications that required training of service personnel by Picker provides a basis for such a claim. It does not because, as discussed earlier, there is no evidence that Picker improperly caused the restrictive specification to be adopted by the Veterans Administration.

There is, therefore, no litigable claim of interference with advantageous relations presented by the evidence in this case.

### 3. *Defamation.*

For the reasons described earlier in connection with Imaging's claims of exclusionary conduct, the evidence is also insufficient to permit a reasonable factfinder to conclude that Picker defamed Imaging. Accordingly, it is not necessary to decide Picker's contention that the defamation claim is barred by the statute of limitations.

### 4. *Mass.Gen.L. ch. 93A and Unfair Competition.*

Imaging alleges unfair competition which, in Massachusetts, is addressed by Mass.Gen.L. ch. 93A. *See, e.g., Smartfoods, Inc. v. Northbrook Property and Casualty Co.*, 35 Mass.App.Ct. 239, 244–45, 618 N.E.2d 1365 (1993) (analyzing common law unfair competition claim under the standards of Mass.Gen.L. ch. 93A). To maintain a claim that Mass.Gen.L. ch. 93A has been violated, the events allegedly constituting unfair competition must have occurred "primarily and substantially" in Massachusetts. *Clinton Hospital Assoc. v. Corson Group, Inc.*, 907 F.2d 1260, 1265–66 (1st Cir.1990); *Bushkin Associates, Inc. v. Raytheon Co.*, 393 Mass. 622, 473 N.E.2d 662, 671–72 (1985); *see also Maruho Co., Ltd. v. Miles, Inc.*, 1993 WL 81453, *5 (D.Mass. Mar. 8, 1993), *aff'd*, 13

---

**8.** The instance in which Quinn states he was told by Picker that he would have to wait 26 weeks for a replacement part involved a Picker CT Scanner at Computer Design Associates. Quinn Aff., Imaging App., Ex. 1, ¶ 2.

F.3d 6 (1st Cir.1993); *Val Leasing, Inc. v. Hutson*, 674 F.Supp. 53, 56–57 (D.Mass. 1987).

In this case, the evidence demonstrates that virtually all of Picker's purported misconduct, and any harm to Imaging, occurred outside of Massachusetts. Thus, Imaging has failed to present a claim under Mass. Gen.L. ch. 93A which can survive this motion for summary judgment.

## III. *ORDER.*

For the foregoing reasons, Picker's motion for summary judgment on Imaging's counterclaims is hereby ALLOWED.