**PBM PRODUCTS, INC. Plaintiff.**

v.

**MEAD JOHNSON & COMPANY Defendant.**

**No. 3:01CV199.**

United States District Court, E.D. Virginia, Richmond Division.

Oct. 25, 2001.

GA, Eric Peter Schoonveld, Terrence Patrick Canade, Lord, Bissell & Brook, Chicago, IL, Corliss Scroggins Lawson, Lord, Bissell & Brook, Atlanta, GA, for PBM Products, Inc.

John Gary Maynard, III, Stephen Patrick Demm, Michael Christian Whitticar, Hunton & Williams, Richmond, VA, John Lyons Marshall, Jr., Betty S.W. Graumlich, McSweeney & Crump, Richmond, VA, Robert Stephen Bennett, Carl Stephen Rauh, Skadden, Arps, Slate, Meagher & Flom, Washington, DC, Constance S. Huttner, Stephanie Joy Kamerow, Kenneth Alan Plevan, Skadden, Arps, Slate, Meagher & Flom, New York, NY, Behnam Dayanim, Paul Hastings Janofsky & Walker, Washington, DC, Patrick Shoulders, Ziemer, Stayman, Weitzel & Shoulders, LLP, Evansville, IN, for Mead Johnson & Company.

Jay Ward Brown, Levine, Pierson Sullivan & Koch, Washington, DC, for New York Times Co.

### *MEMORANDUM OPINION*

SPENCER, District Judge.

THIS MATTER comes before the Court on Defendant Mead Johnson & Company's ("Mead") motion for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, seeking to dismiss the claim of Plaintiff PBM Products, Inc. ("PBM") for prospective corrective advertising expenditures. For the reasons that follow, Defendant's motion is DENIED.

**I.**

Mead and PBM are competitors in the infant formula industry. PBM specializes in "store" brands (i.e., Wal–Mart formula, Kroger). When PBM started selling infant formula in 1997, private label infant formula had not previously been sold.

Paul Geoffrey Gill, Office of the Public Defender, Richmond, VA, Charles Michael Sims, Robert Francis Redmond, Jr., LeClair Ryan, Richmond, VA, David Gregory Greene, Lord, Bissell & Brook, Atlanta,

During Plaintiff's first year of operations in 1998, its net sales were roughly $15 million and its net profits were $2.7 million. In 1999 its net sales were $28.8 million and its net profits $4.6 million. In 2000, its net sales were $52.5 million and its net profits $7.9 million. Plaintiff's net sales for 2001 (through July 31, 2001) were $44.4 million; estimates for the current year indicate net sales at $80–$85 million. PBM's current market share is approximately 3% of the $3.1 billion infant formula industry.

Mead sells formula under the Enfamil brand name, and along with Abbott Laboratories, controls $2.9 billion of the infant formula market. Plaintiff's company is minuscule in comparison to Mead Johnson and Abbott Laboratories, but is one of the fastest growing companies in the industry.

In its Complaint, Plaintiff alleged that Mead Johnson started an advertising campaign that falsely and unfairly claimed that the private label infant formulas fell short of recommended levels for calcium and folic acid. This Court entered an Order on April 5, 2001 enjoining Mead from making false claims regarding Plaintiff's products and requiring Mead to withdraw all publications that contained the false claims. In its Order, this Court acknowledged PBM's likelihood of success on the merits of its Complaint.

PBM seeks to recover all of the damages sustained as a result of Mead's false advertising, including all expenditures required to correct the false statements. To support its claim to such recovery, PBM relies on the expert report of L. Bradford Armstrong. He advises that PBM should recover $80.3 million in prospective advertising damages.

## II.

A motion for summary judgment lies only where "there is no genuine issue as to any material fact" and where the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Haavistola v. Community Fire Co. of Rising Sun, Inc.*, 6 F.3d 211, 214 (4th Cir. 1993); *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir.1985). The Court must view the facts and the inferences drawn therefrom in the light most favorable to the party opposing the motion. *Ballinger v. North Carolina Agr. Extension Serv.*, 815 F.2d 1001, 1004 (4th Cir.), *cert. denied*, 484 U.S. 897, 108 S.Ct. 232, 98 L.Ed.2d 191 (1987). While viewing the facts in such a manner, the Court looks to the affidavits or other specific facts to determine whether a triable issue exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). According to the Fourth Circuit,

> In determining whether summary judgment may be granted, the district court must perform a dual inquiry into the *genuineness* and *materiality* of any purported factual issues. Whether an issue is genuine calls for an examination of the entire record then before the court in the form of pleadings, depositions, answers to interrogatories, admissions on file and affidavits, under Rule 56(c) and (e) .... Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice. A trial, after all, is not an entitlement. It exists to resolve what reasonable minds would recognize as real factual disputes.

*Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir.1985) (emphasis original). Summary judgment is not appropriate if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477

U.S. at 248, 106 S.Ct. 2505. However, if a motion for summary judgment is "properly supported by affidavits, depositions, or answers to interrogatories, the non-moving party may not rest on mere allegations or denials of the pleadings ... [but] must respond by affidavits or otherwise and present specific facts demonstrating a triable genuine issue of material fact." *Garrett v. Gilmore*, 926 F.Supp. 554, 555 (W.D.Va.1996), *aff'd*, 103 F.3d 117, 1996 WL 667765 (4th Cir.1996).

### III.

Defendant contends that PBM's claim for prospective corrective advertising expenditures should be dismissed for two reasons. First, Mead alleges that PBM is not entitled to such relief because it failed to take advantage of corrective measures that were available to it and within its financial means. Second, Mead argues that its $80.3 million claim is speculative. In the alternative, Defendant requests that the any award for prospective corrective advertising be limited to twenty five percent of Defendant's total expenditures towards the store brand claims. Each of these arguments will be discussed, in turn.

#### A. Failure of PBM to Employ its own Corrective Measures

Mead argues that PBM's failure to utilize corrective measures to mitigate against any damage caused by Mead's actions precludes Plaintiff from recovering any amount of prospective corrective advertising expenditures. Plaintiff counters that it did attempt to counteract the effects of Mead's false statements.

While courts frequently award plaintiffs compensation for corrective advertising efforts that have already been undertaken by plaintiffs prior to the final adjudication of their cases, *see, e.g., Petersime & Son v. Robbins*, 81 F.2d 295 (10th Cir.

1936); *ALPO Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 969 (D.C.Cir. 1990) ("In a false-advertising case...actual damages...can include...the costs of any completed advertising that actually and reasonably responds to the defendant's offending ads..."); *Cf. JTH Tax, Inc. v. H & R Block Eastern Tax Services*, 128 F.Supp.2d 926, 946–47 (E.D.Va. Feb.23, 2001) (denying plaintiff's request for corrective advertising expenditures where plaintiff failed to prove that its advertisement strategy implemented before litigation was actually corrective and undertaken in response to the defendant's misstatements), there have only been a few false advertising case where a federal court granted prospective corrective advertising expenditures, *see U–Haul International, Inc. v. Jartran, Inc.*, 793 F.2d 1034 (9th Cir.1986); *Novell, Inc. v. Network Trade Ctr., Inc.*, 25 F.Supp.2d 1233, 1241 (D.Utah 1998).

■ In order for a plaintiff to recover purely prospective corrective advertising expenditures, he or she must prove that such expenditures are corrective, *see JTH Tax, Inc.*, 128 F.Supp.2d at 947, that the expenditures are a surrogate for measuring plaintiff's actual damages, *see Gillette v. Wilkinson Sword, Inc.*, 1992 WL 30938, *4 (S.D.N.Y.1992), and that financially, he or she is unable to undertake a corrective advertising campaign concurrently with the wrong a plaintiff seeks to redress in court, *see Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365, 1375 (10th Cir.1977). In *JTH Tax, Inc.*, the court refused to award plaintiff its responsive advertising expenses because plaintiff failed to show that the cost of advertising was a loss or that the plaintiff's efforts were intended to ameliorate the effects of the defendant's false advertising campaign. *JTH Tax, Inc.*, 128 F.Supp.2d at 946. The advertising costs in

that case was an estimate for all of the plaintiff's tax preparation franchises, not just the franchises affected by the defendant's misdeeds. *Id.* Additionally, the plaintiff had committed to its advertisement strategy before the defendant's started its false advertisements. *Id.* Therefore, the plaintiff failed to establish a causal connection between the defendant's acts and its advertising "response."

In the cases where prospective corrective advertising expenditures have been granted, "the cost of advertising measure for damages [was] . . . a surrogate for plaintiff's damages or defendant's profit." *Gillette,* 1992 WL 30938 at *5. For example, in *U–Haul International, Inc. v. Jartran, Inc.,* the district judge awarded plaintiff twice the sum of the cost of advertising campaign to the defendant and the cost of corrective advertising by the plaintiff. *See U–Haul International, Inc.,* 793 F.2d at 1037. In that case, calculating damages by adding the costs of the false advertising campaign to the cost of a corrective campaign resulted in the same figure as if the court calculated actual damages by relying on the plaintiff's revenue projections. *Id.* The advertising campaign costs were a surrogate for plaintiff's actual damages.

The Tenth Circuit established in the seminal case, *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.,* that prospective corrective advertising expenditures should be awarded to a plaintiff who does not have the financial ability to institute its own corrective advertising campaign to recover. There, the defendant had clearly infringed upon the plaintiff's trademark. The plaintiff could not afford to engage in counter-advertising to lessen the effect of the defendant's behavior. The court was placed in the precarious position of deciding whether the plaintiff should obtain from the defendant the cost of eradicating customer confusion through advertisements, even though the plaintiff had not incurred out-of-pocket expense to do so, or whether "the law should apply differently to those who have the economic power to help themselves concurrently with the wrong than to those who must seek redress through the courts." *Big O Tire Dealers, Inc.,* 561 F.2d at 1375. The defendant argued that the plaintiff's relief should be limited to recovering advertising expenses incurred before trial. The court decided to award the plaintiff these damages, stating, "the effect of [the defendant's argument] would be to recognize that Big O has a right to the exclusive use of its trademark but has no remedy to be put in the position it was in prior to [the infringement]." *Id.* The record clearly established that the Big O did not have the money to finance its own advertising campaign, and it was clear that the impact of the defendant's false advertising campaign "was devastating." *Id.*

However, the Ninth Circuit held that prospective corrective advertising expenditures are compensatory damages, that should be awarded irrespective of whether the plaintiff lacks the finances to conduct a corrective advertising campaign before trial. *Adray v. Adry–Mart, Inc.,* 76 F.3d 984, 988–89 (9th Cir.1995). The district court—espousing the exact argument Mead now asserts—was reversed by the appellate court.

■ PBM engaged in its own corrective advertising.[1] In late March 2001, Plaintiff started a public relations campaign designed to publicize the current lawsuit. PBM prepared a television commercial de-

---

1. Defendant's Motion for Summary Judgment is directed to prospective corrective advertising expenditures. It does not address the expenses already incurred by PBM for a reparative advertisement campaign.

scribing its dispute with Mead and informing the public of the preliminary injunction that was awarded in Plaintiff's favor. On May 11, 2001, PBM sent a "STAT–GRAM" message to 10,000 pediatricians with large practices. While PBM only spent $50,000 of the $200,000–$250,000 budgeted for corrective advertising, it estimates that $80.3 million is necessary for its campaign to be effective. Contrary to Mead's contentions, PBM has alleged that it is unable to afford a current campaign (Dep. Manning at 145).[2] Moreover, PBM's president and owner contends that anything less than a full campaign would be diluted and ineffective (Dep. Manning at 146), therefore no further action has been taken. This Court finds that there is a genuine issue of material fact as to whether Plaintiff could afford its own contemporaneous corrective advertising campaign. Therefore, summary judgment is not appropriate on this ground.

**B. Bar on Speculative Damages**

**1. Lanham Act**

Under the Lanham Act, "[t]o recover damages for false advertising, a plaintiff 'must prove both actual damages and a causal link between [the defendant's] violation and those damages.'" *Black & Decker, Inc. v. Pro–Tech Power, Inc.,* 26 F.Supp.2d 834, 863 (*quoting United Indus. Corp. v. Clorox Corp.,* 140 F.3d 1175, 1180 (8th Cir.1998)) (alteration in original). There is no consensus regarding the degree of certainty the Lanham Act requires for damage awards. The Fourth Circuit has not decided the issue, and other circuits have differed in their assessment of what is required. *See First Sav. Bank, F.S.B. v. U.S. Bancorp,* 117 F.Supp.2d

1078, 1087 (D.Kan.2000) (holding that the Lanham Act does not allow speculative or uncertain damage awards.); *Otis Clapp & Son, Inc. v. Filmore Vitamin Co.,* 754 F.2d 738 (7th Cir.1985) (stating that in an unfair trade practices case, plaintiff is held to a lower burden of proof in determining the exact amount of damages); *Fuller Products Co. v. Fuller Brush Co.,* 299 F.2d 772 (7th Cir.1962) (stating that plaintiff had burden of proving actual damages, even though the result could only be approximate); *Ramada Inns, Inc. v. Gadsden Motel Co.,* 804 F.2d 1562 (11th Cir.1986) (stating that the finding of damages was not speculative where it was supported by credible expert testimony); *ALPO Petfoods, Inc. v. Ralston Purina Co.,* 913 F.2d 958, 969–70 (D.C.Cir.1990) ("When assessing these actual damages, the district court may take into account the difficulty of proving an exact amount of damages from false advertising.").

In assessing the evidentiary sufficiency of a claim for prospective corrective advertising, courts have considered the existence and reliability of consumer surveys. *See Warner–Lambert Co. v. FTC,* 562 F.2d 749 (D.C.Cir.1977); *Novartis Corp. v. FTC,* 223 F.3d 783 (D.C.Cir.2000). In both of these cases, the FTC presented extensive evidence showing a pervasive and deeply entrenched consumer belief in the accuracy of the defendants' false statements. *See In re Warner–Lambert Co.,* 86 F.T.C. 1398 (1975); *In re Novartis Corp.,* No. 9279, 1999 FTC LEXIS 63, at *60–90 (May 27, 1999).

█ Plaintiff relies on the report of its expert, Bradford Armstrong, to support its claim for prospective corrective advertising expenses. PBM argues that its costs

---

**2.** Mead argues that PBM could afford proposed print media professional advertising. PBM realized almost $8 million in net profits in 2000. The print media advertisements would only cost $150,000. Mead points out that this is less than the remainder of PBM's original budget for print media advertising in 2001.

for corrective advertising are high because, unlike Mead, it does not have an existing sales force, it will have to hire and train additional personnel, and it will have to design a comprehensive campaign. Plaintiff also contends that it will be more difficult to reverse Mead's message than it was for Mead—with its 40% market share—to disseminate it. PBM has provided sufficient evidence of the expenditures necessary to combat the effects of Mead's false advertisements to withstand this summary judgment motion.

### 2. State Law

■ Under Virginia law, speculative or uncertain damages are not recoverable. *See, e.g., Haywood v. Massie*, 188 Va. 176, 180, 49 S.E.2d 281, 283 ("[E]vidence of expected profits was too vague, certain and indefinite to warrant a judgment therefor."); *Scheduled Airlines Traffic Offices, Inc. v. Objective, Inc.*, 180 F.3d 583, 588 (4th Cir.1999) ("any estimate would be rooted in speculation and conjecture, both of which constitute improper grounds for damages under Virginia law."). While Mead relies on cases that espouse this doctrine in the contract law context, it is equally applicable to tort claims. *See id.* (nuisance and trespass claims); *Tullock v. Hoops*, 206 Va. 665, 670, 145 S.E.2d 152, 155 (personal injury and property damage sustained in automobile accident).

Neither side fully explores the specificity of damages required under Virginia law in this summary judgment motion. However, PBM does not clearly state that it is seeking prospective corrective advertising expenditures solely under the Lanham Act. Therefore, there is a possibility that it is also seeking this damage award under its state law claims. Presumably, Mead argues that PBM's state law claims should fail for the same lack of specificity and speculation that justify dismissal under the

Lanham Act. PBM's counter-arguments would also be the same as under the Lanham Act. In light of the standard of review for a summary judgment motion, Defendant's Motion as to this claim should be DENIED.

### C. 25% Cap on Prospective Corrective Advertising Expenditure Award

If this Court does not dismiss PBM's prospective corrective advertising claim altogether, Mead seeks to limit the claim for advertising damages to twenty-five percent of Mead's expenditures in disseminating the store brand claims. Plaintiff argues that it is entitled to whatever amount of money is required to make it whole.

The primary case on a twenty-five percent limitation is *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365 (10th Cir.1977). In *Big O Tire Dealers, Inc.*, the court reduced the $2.8 million compensatory and $16.8 million punitive damage award to twenty-five percent of what Goodyear spent on its false advertising campaign against the plaintiff. The court explicitly cited to the Federal Trade Commission ("FTC") twenty-five percent rule, echoing that agency's belief that "a dollar-for-dollar expenditure for corrective advertising is unnecessary to dispel the effects of confusing and misleading advertising." *Id.* at 1376.

Mead appropriately notes that several courts have adopted the FTC rule, applied in *Big O Tire Dealers, Inc. See Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499, 506 (7th Cir.1992) (trademark case); *West Des Moines State Bank v. Hawkeye Bancorporation*, 722 F.2d 411, 414 (8th Cir.1983) (trademark case); *Adray v. Adry–Mart, Inc.*, 76 F.3d 984, 989 n. 2 (9th Cir.1995) (trademark case). However, the Fourth Circuit has not applied this rule. Therefore, this Court will not impose a cap on

Plaintiff's request for prospective corrective advertising expenses at this juncture.

## IV. CONCLUSION

For the reasons discussed in this memorandum, Defendant's Motion is DENIED.