**Carl HUBER, Plaintiff,**

v.

**JLG INDUSTRIES, INC., Defendant.**

**No. CIV.A.00–40079–NMG.**

United States District Court,
D. Massachusetts.

May 19, 2003.

James B. Dolan, Badger, Dolan, Parker & Cohen, Boston, MA, Gary C. Duvall, Miles & Stockbridge, P.C., Towson, MD, Scott J. Tucker, Tucker, Heifetz & Saltzman, Boston, MA, for JLG Industries, Inc., Defendant.

Michael R. Fuller, Law Office of Michael Fuller, Boston, for Carl Huber, Plaintiff.

## MEMORANDUM AND ORDER

GORTON, District Judge.

In August, 2002, a jury returned a verdict in favor of plaintiff Carl Huber ("Huber") for $5 million for injuries he sustained as a result of the breach of an implied warranty of merchantability by defendant JLG Industries, Inc. ("JLG"). The breach was with respect to either a design defect in, or a failure to warn in the instructions accompanying, JLG's AM–24 AccessMaster manlift. The jury assessed

60% of the award ($3 million) for the partial seizure disorder that Huber sustained thereby.

JLG now moves this Court for judgment as a matter of law pursuant to Fed. R.Civ.P. 50 or, in the alternative, for a new trial pursuant to Fed.R.Civ.P. 59. JLG also moves the Court to reduce the jury verdict as "grossly excessive" in the event the Court denies the motion for judgment as a matter of law or, in the alternative, for a new trial. JLG offers four grounds for its motion which are discussed *seriatim* below.

## I. Motion for Judgment as a Matter of Law, or in the Alternative, for a New Trial

### A. Standard of Review

 Judgment as a matter of law pursuant to Fed.R.Civ.P. 50(b) can be granted only when "the evidence, together with all reasonable inferences in favor of the verdict, could lead a reasonable person to only one conclusion, namely, that the moving party was entitled to judgment." *Down East Energy Corp. v. Niagara Fire Ins. Co.*, 176 F.3d 7, 15 (1st Cir.1999) (quoting *PH Group Ltd. v. Birch*, 985 F.2d 649, 653 (1st Cir.1993)). A new trial pursuant to Fed.R.Civ.P. 59(a) should be granted only where the court is convinced that the jury verdict was a "seriously erroneous result." *Coffran v. Hitchcock Clinic, Inc.*, 683 F.2d 5, 6 (1st Cir.1982).

### B. Expert Witnesses

 The Federal Rules of Evidence provide that:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill,

experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. As Rule 702 makes clear, expert testimony is admissible only if it is both relevant and reliable. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–49, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).[1] The Supreme Court has identified four factors that may be helpful, but which are neither necessary nor sufficient, to determine the reliability, and hence admissibility, of an expert's testimony: (1) whether the theory or technique can be and has been tested; (2) whether the technique has been subject to peer review and publication; (3) the technique's known or potential rate of error and the existence and maintenance of standards controlling its operation; and (4) the level of the theory or technique's acceptance within the relevant discipline. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593–94, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (scientific expert testimony); *see also Kumho Tire*, 526 U.S. at 149–50, 119 S.Ct. 1167 (holding that district courts may consider *Daubert's* four factors for all expert testimony, not just scientific expert testimony). A district court's determination of admissibility is entitled to great respect and may be overturned only for an "abuse of discretion." *General Elec. Co. v. Joiner*, 522 U.S. 136, 141, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).

JLG argues that this Court erred in admitting the expert testimony of Huber's causation expert, Dr. Catherine Phillips, and forensics experts, Messrs. Darry

---

1. The Federal Rules of Evidence also require that experts be sufficiently qualified but JLG does not challenge the qualifications of Huber's experts.

Holt and William Dobson. JLG argues that all of Huber's expert testimony was unreliable and that the testimony of Dr. Phillips was also irrelevant.

### 1. Dr. Phillips's Causation Testimony

█ With respect to the relevance of Dr. Phillips' testimony, JLG argues that the factual predicate to her testimony that the accident caused Huber's partial seizure disorder, i.e. a "significant head injury" to Huber, did not occur. But that argument is unpersuasive because it is not entirely clear that a significant head injury is a predicate to Dr. Phillips' conclusion that the accident caused Huber's seizures.

Assuming *arguendo* that a significant head injury is a predicate, sufficient evidence was submitted to the jury from which it could reasonably have determined that a significant head injury did occur. The jury heard testimony that 1) Huber fell 25 feet to the floor, 2) he landed five or six feet away from the lift, 3) he was lying face down on the floor, 4) his nose was bleeding, 5) there was a resulting pool of blood on the floor, 6) at least one tooth was damaged by the fall, 7) the lift had fallen on his back after the fall and 8) he sustained wrist and ankle fractures. Of course, there was also evidence that Huber did not sustain a significant head injury from the fall but, plainly, the jury did not credit that evidence. In summary, JLG's arguments here go to the weight of the evidence, a jury contest that JLG clearly lost at trial and one as to which JLG will not be afforded a second bite at the apple.

█ JLG also argues that Dr. Phillips' testimony was unreliable and did not satisfy any of the *Daubert* factors. But it is important to recognize at the outset that the *Daubert* factors do not have to be "met" before expert testimony can be found reliable. Since *Daubert*, Rule 702 has been amended to require that (1) ex-

pert testimony be based upon sufficient facts or data, (2) expert testimony be the product of reliable principles and methods, and (3) those principles and methods be applied reliably to the facts of the case. *See* Fed.R.Evid. 702. It is true that many cases rely on the *Daubert* factors as evidence of the three new criteria in Rule 702 but the *Daubert* factors are not talismanic.

█ In any event, Dr. Phillips' testimony met all three of the Rule 702 criteria in this case. Her causation testimony was based, at least in part, on the following sufficient facts and data: 1) EEG scans of Huber's brain showing intermittent left mid-temporal spikes, a finding entirely consistent with partial seizure disorder, 2) Huber never had, nor ever was diagnosed as having, seizures before the accident and 3) Huber suffered a head injury in the accident, hitting the floor hard enough to slightly displace a tooth and fracture a number of bones. Moreover, Dr. Phillips' causation testimony was, in part, the product of the following reliable principles and methods: 1) her specialty and training is in epilepsy and seizure disorder, 2) she was Huber's treating physician for his seizure disorder and had seen him after the accident but before litigation ensued and 3) she relied on brain images from EEG and MRI scans. Finally, Dr. Phillips reliably applied the principles and methods to the facts of this case.

JLG has failed to show how the expert testimony of Dr. Phillips did not meet the *Daubert* criteria. Its arguments, again, go to the weight of her testimony and this Court will not step on the "scales" used by the jury. Because "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence," *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786, and because all three methods

were available to JLG at the trial, this Court will not disturb the jury's verdict in that regard.

## 2. The Forensic Testimony of Messrs. Holt and Dobson

■ JLG argues that the forensic testimony of Messrs. Holt and Dobson is unreliable under *Daubert* because they offered nothing more than a subjective belief that a larger diameter sheave may have extended the time before the lift cables ultimately wore out. JLG also argues that they performed no calculations, constructed no model or prototype and failed to assess the mechanical feasibility and cost of their alternative designs but its assertions are unsupported by any legal analysis with respect to why their testimony did not meet the *Daubert* standards. JLG offered the same arguments to the Court before trial. They were rejected then and are rejected now.

Both experts performed separate and distinct analyses of the lift which was involved in the accident. Holt conducted a field examination of the lift at Spectran and examined the lift cables and other background information. Dobson performed a close analysis of the cables in order to determine the cause of their failure. As a result of their analyses, the two experts concluded that the sheaves, or pulleys, of the cable should have been designed with a larger diameter and that the defendant should have used chains rather than cables in its manufacture of the lift.

Dobson and Holt are experienced mechanical engineers. They took notes, created sketches and maintained files regarding the lift. Dobson performed mathematical calculations and although Holt did not, his role in the analysis concerned background information and observations. In addition, the two experts did not "merely conceptualize" alternative designs. Dobson based his conclusion that

chains would have been a safer and stronger material on his experience as a metallurgist and his analysis of materials used in manufacturing machinery.

In summary, although their testimony could have been more precise, Dobson and Holt based their conclusions upon their own observations of the aerial lift. While not based on exhaustive studies, their approaches were sound given the rather discrete question each was asked to consider. Their testimony was, therefore, sufficiently reliable for purposes of Fed.R.Evid. 702, as informed by *Daubert.*

## C. Liability

■ JLG argues that the record does not support the jury's finding that the lift was unreasonably dangerous because either it had a design defect or the warnings and instructions accompanying the lift were inadequate. JLG does not argue that the jury instructions were inadequate but simply that the evidence at trial was insufficient to support the verdict. JLG's arguments are unpersuasive.

With respect to Huber's claim that the lift was unreasonably dangerous because of its defective design, the jury heard the following testimony: 1) JLG records showed that it expected the cables to last for at least 20,000 cycles, 2) Huber's lift was cycling between 14,600 and 18,250 per year, 3) the cables on Huber's lift had been replaced nine months before the accident and 4) the sheaves on the lift were the cause of the cable fatigue. A reasonable jury could have concluded from that testimony that the sheaves, 3.5 inches in diameter, caused early cable fatigue and the lift to collapse and that a sheave larger in diameter would have rectified the problem.

The same testimony supports a finding by the jury that the lift was unreasonably dangerous because the warnings or instructions did not adequately warn of the

dangers of the lift. The jury heard testimony that the instructions did not inform the purchaser of the expected useful life of the cables based upon the number of cycles, even though JLG knew before selling the lift to the purchaser that the cables were expected to last between 20,000 and 26,000 cycles. Rather, the instructions recommended only routine visual inspections of the lift before each use and more thorough inspections infrequently.

In summary, there was sufficient evidence to support the jury's finding of JLG's liability. JLG's arguments to the contrary go to the weight and not the sufficiency of the evidence and are, therefore, insufficient to warrant judgment in JLG's favor as a matter of law or a new trial.

### D. Causation

JLG argues that, even if there were sufficient evidence that the lift was unreasonably dangerous under either or both of Huber's theories of liability, there was insufficient evidence that such a condition proximately caused Huber's injuries. Specifically, JLG argues that no reasonable jury could either conclude that the alleged defective design or defective warnings and instructions caused Huber's injuries or attribute Huber's partial seizure disorder to the accident. JLG also contends that Huber was comparatively negligent. JLG's arguments are conclusory and repeatedly mischaracterize the evidence that was presented. JLG also disputes again the admissibility of testimony of Huber's experts which, as determined above, was properly admitted. Once again, its arguments go to the weight of the evidence and not to the legal sufficiency thereof.

### II. *Motion for Remittitur*

JLG argues that it is entitled to a reduction in the amount of damages that the jury awarded to Huber. Specifically, it argues that $3 million for a partial seizure

disorder and $2 million for various orthopedic and dental injuries are grossly excessive amounts because Huber proved only $17,144 in specific monetary damages.

A district court's decision to reduce a jury award is reviewed for abuse of discretion. *See Conjugal P'ship v. Conjugal P'ship*, 22 F.3d 391, 397 (1st Cir. 1994). However, while the reviewing court "must give the benefit of every doubt to the judgment of the trial judge ... surely there must be an upper limit, and whether that has been surpassed is not a question of fact with respect to which reasonable men may differ, but a question of law." *Anthony v. G.M.D. Airline Servs., Inc.*, 17 F.3d 490, 493 (1st Cir.1994) (quoting *Dagnello v. Long Island R.R. Co.*, 289 F.2d 797, 806 (2d Cir.1961)). The question of whether a jury's damage award should be reduced, therefore, is, curiously enough, a question of law subject to review for abuse of discretion.

That question of law defies a sure answer because of a lack of clear precedent. The First Circuit has said that an award of damages may not exceed a "rational appraisal or estimate of the damages that could be based on the evidence before the jury." *Smith v. Kmart Corp.*, 177 F.3d 19, 29 (1st Cir.1999) (quoting *Milone v. Moceri Family, Inc.*, 847 F.2d 35, 36 (1st Cir.1988)). Alternatively, a jury award may not be "grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand." *Id.* at 30 (internal quotation marks omitted). The crucial question remains: What is "grossly excessive," "inordinate," "shocking to the conscience of the court," or a "denial of justice"?

In any event, when considering a challenge to a jury award, the evidence must be viewed in the light most favorable

to the verdict. *Id.* A district court should not be too quick to conclude that a jury award was excessive because "[t]ranslating legal damage into money damages is a matter 'peculiarly within a jury's ken,' especially in cases involving intangible, non-economic losses." *Id.* (citing *Wagenmann v. Adams,* 829 F.2d 196, 215 (1st Cir. 1987)).

■ In this case, there are two damages awards to consider. First, the jury awarded $3 million to Huber for his partial seizure disorder. It heard the following testimony in that regard: Huber was 21 years old at the time of the accident, the seizures began no sooner than four weeks after the accident, he has had approximately 50 seizures that have caused him to pass out and occasionally caused him physical injury and permanent facial scarring from the falls after he passes out, he has had other recurring "non-pass-out" seizures, he constantly takes medication for the seizures which cause various side effects, including equilibrium imbalances, at the age of 27 he no longer has a driver's license, the disorder has caused him to quit his job and, possibly, to lose another and he does not now work and collects social security for "epilepsy". The jury also heard testimony from Huber's expert that the disorder is not yet and may never be under control, and, thus, "most likely will be chronic." Huber's partial seizure disorder is, therefore, a serious condition and will likely be a lifelong chronic disorder and a $3 million award is a "rational appraisal or estimate of the damages ... based on the evidence before the jury." *Id.*

■ The jury's second award to Huber was for $2 million for damages related to his wrist and ankle fractures and knee, back and dental injuries ("orthopedic and dental injuries") suffered as a result of the accident. The award for pain and suffering and other intangibles was more than 250 times the out-of-pocket expenses incurred for those injuries.

With respect to the fractures, Huber was in casts for almost three months and in a wheel chair for two weeks. He also underwent surgery on his wrist and his knee. There was some evidence that Huber has a temporary partial disability and could expect degenerative arthritis as a result of his wrist and ankle fractures and Huber needed therapy on his back for about five years after the accident. Huber also testified that his knee and back pain persisted until trial. With respect to his dental injuries, Huber had a root canal on one tooth with no further evidence of injury or pain.

It was Huber's partial seizure disorder and not his orthopedic and dental injuries, however, that caused him to be unable to work and to lose his driver's license which caused him to lose approximately $9,900 in lost wages. Thus, with respect to his out-of-pocket expenses ($17,144), the most that can be attributed to the orthopedic and dental injuries is $7,244 in medical expenses. The portion of the $2 million that accounts for pain and suffering and other intangibles is, therefore, approximately $1,992,000. There is no evidence that the orthopedic and dental injuries have substantially impacted Huber's life or will pose lifelong, or even short-term problems for Huber. Considering the lack of evidence that Huber will incur future expenses as a result of those injuries, in stark contrast to the evidence with respect to Huber's partial seizure disorder, the $2 million award is grossly excessive and remittitur is warranted.

■ While it is not difficult to conclude that $2 million is grossly excessive for the orthopedic and dental injuries that Huber suffered, a rational appraisal or estimate of damages that would not be so excessive is more problematic. The

First Circuit applies the "least intrusive standard" in calculating a remittitur. *Conjugal P'ship,* 22 F.3d at 398 (internal quotation marks omitted). Under that standard, the jury award should be reduced to the highest amount at which it is not excessive. *Id.*

After "careful review of the record and thoughtful consideration of other cases," the evidence suggests that any award for Huber's orthopedic and dental injuries more than $250,000 would be excessive. *Koster v. Trans World Airlines, Inc.,* 181 F.3d 24, 36 (1st Cir.1999); *see also Conjugal P'ship,* 22 F.3d at 396–98; *Anthony,* 17 F.3d at 493–96; *Marchant v. Dayton Tire & Rubber Co.,* 836 F.2d 695, 703–04 (1st Cir.1988). That award takes into account the evidence at trial concerning Huber's actual injuries and associated medical costs, the pain and suffering he experienced in the past and the pain and suffering, if any, that he may sustain in the future as a result of those injuries. That amount is not necessarily what this Court would award if it were the finder of fact but it is the highest, non-excessive award that the evidence at trial justifies.

If Huber does not agree to the remittitur, JLG is entitled to a new trial on damages resulting from Huber's orthopedic and dental injuries. *See Koster,* 181 F.3d at 36 (describing "maximum recovery rule" whereby plaintiff is put to the choice of accepting the remittitur or taking his chances at a new trial on the issue of damages).

### ORDER

For the reasons set forth in the Memorandum above, defendant's renewed motion for judgment as a matter of law or, in the alternative, for a new trial (Docket No. 57) is **DENIED**. Defendant's motion for remittitur (Docket No. 57) is **ALLOWED**, in part, and denied, in part, in that the jury award of $3,000,000 for the partial seizure disorder is left undisturbed but the jury award for Huber's orthopedic and dental injuries in the amount of $2,000,000 is reduced to $250,000. If the plaintiff, Huber, rejects the remittitur, JLG will be granted a new trial on the issue of damages resulting from Huber's orthopedic and dental injuries.

So ordered.