**FIRST ACT INC., Plaintiff**

v.

**BROOK MAYS MUSIC COMPANY, INC., Defendant.**

**No. CIV.A. 03–12020–EFH.**

United States District Court,
D. Massachusetts.

April 26, 2006.

---

Julia Huston, Bromberg & Sunstein LLP, Lee C. Bromberg, Bromberg & Sunstein LLP, Lisa M. Tittemore, Bromberg & Sunstein, Meredith L. Ainbinder, Bromberg & Sunstein, Sarah C. Peck, Bromberg & Sunstein, Boston, MA, for First Act Inc., Plaintiff.

David J. Volkin, Fitzhugh, Parker & Alvaro LLP, Edward P. O'Leary, Fitzhugh, Parker & Alvaro LLP, Jeffrey A. Novins, Fitzhugh, Parker & Alvaro LLP, Michael A. Fitzhugh, Fitzhugh, Parker & Alvaro, LLP., Barbara L. Horan, Fitzhugh, Parker & Alvaro LLP, Boston, MA, for Brook Mays Music Company, Inc., Defendant.

### MEMORANDUM AND ORDER

HARRINGTON, Senior District Judge.

### INTRODUCTION

First Act Inc. ("First Act") manufactures and sells band instruments, including trumpets, flutes, and clarinets. Brook Mays Music Company, Inc. ("Brook Mays") is a band instrument retailer. The genesis of this case is Brook Mays' 2003 publication of a document titled "ISO

Alert." First Act argued at trial that Brook Mays' ISO Alert falsely disparaged the quality of First Act band instruments, and that such disparagement caused significant harm to their sales and reputation. In December, 2005, a jury returned a verdict in favor of First Act in the amount of $20,768,309 for its claims against Brook Mays sounding in false advertising under the Lanham Act, commercial disparagement, and tortious interference with an existing or prospective contractual relationship. This matter is now before the Court on Defendant Brook Mays' Motion for Judgment Notwithstanding the Verdict, or in the Alternative for a New Trial, and for Remittitur. For the reasons discussed in more detail below, defendant's motion is granted in part. Defendant's request for Judgment Notwithstanding the Verdict pursuant to Fed.R.Civ.P. 50 is denied. Defendant's Motion for a New Trial and Remittitur under Fed.R.Civ.P. 59 is also denied, except that a remittitur is granted with respect to the damages awarded by the jury for harm to and remediation of First Act's reputation.

## DISCUSSION

Of the numerous arguments set forth in defendant's motion, two bear specific mention and will be discussed herein. First, defendant argues for a new trial on First Act's commercial disparagement[1] claim because the jury was improperly instructed as to the standard of fault required under that tort. Second, defendant argues that a remittitur is warranted with respect to the damages awarded for restoration of First Act's reputation. Defendant's remaining arguments for judgment notwithstanding the verdict and for a new trial

find no support in law or in fact, and are hereby dismissed in sum.

## I. *Jury Instruction on Commercial Disparagement*

■ Brook Mays argues that a new trial is warranted because the jury was improperly instructed as to the standard of fault required for the tort of commercial disparagement. Put simply, Brook Mays contends that commercial disparagement requires a showing of *actual malice*. Here, the jury was instructed that *negligence* is sufficient. The standard for a new trial based on an erroneous jury instruction is clear—a new trial is warranted only if the objecting party can show that the instruction in question was "misleading or gave an inadequate understanding of the law." *Steinhilber v. McCarthy*, 26 F.Supp.2d 265, 278 (D.Mass.1998) (citations omitted). Even if the objecting party shows the Court misstated the law, a new trial can be granted only if the Court's error affected the outcome of the trial. *Romano v. U-Haul Int'l.*, 233 F.3d 655, 667 (1st Cir.2000); *Allen v. Chance Mfg. Co., Inc.*, 873 F.2d 465, 469–70 (1st Cir. 1989); *see also* 11 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2886 (2d ed.1995) (jury instructions reviewed under harmless error standard). As discussed more fully below, Massachusetts law is unsettled with respect to whether commercial disparagement requires negligence or actual malice. Therefore, it is not clear, though it may be possible, that the Court's negligence instruction misstated the law. Even if the Court did misstate the law, however, the trial record and verdict returned by the jury show that any error was harmless; a

---

1. The tort of "commercial disparagement" goes by various names, including "injurious falsehood," "disparagement of property," "slander of goods," and "trade libel." For the sake of consistency, "commercial disparagement" is the phrase employed by the Court throughout this Memorandum and Order.

new trial on First Act's commercial disparagement claim is not warranted.

■ Before analyzing the applicable Massachusetts law, some procedural history is in order. This issue was addressed by the parties in their proposed jury instructions and during oral argument to the Court. Plaintiff's counsel argued for a negligence instruction based primarily on two cases: *Flotech, Inc. v. E.I. Du Pont de Nemours Co.*, 627 F.Supp. 358, 365 (D.Mass.1985) and *Bose Corp. v. Consumers Union of United States, Inc.*, 508 F.Supp. 1249, 1259 (D.Mass.1981).[2] According to *Flotech* and *Bose*, the standard of fault for commercial disparagement is determined—as is the case with the closely related tort of defamation[3]—by reference to the plaintiff's status as a "private" versus "public" figure. As the Court stated in *Flotech*:

> Whether a plaintiff is deemed a public or private figure is often crucial. For, if [the plaintiff] is deemed a private rather

**2.** The district court's finding of liability in *Bose* was eventually reversed by the Court of Appeals for the First Circuit. The First Circuit did not, however, reach the issue of whether commercial disparagement requires negligence or actual malice. *See generally Bose Corp. v. Consumers Union of United States, Inc.*, 692 F.2d 189 (1st Cir.1982).

**3.** As Judge Julian stated in *Bose*, commercial disparagement is sometimes confused with corporate defamation. Conceptually the two torts are easily distinguishable. Defamation of a corporation injures the *reputation* of the corporation itself, while commercial disparagement injures the reputation of its *products*. *Bose*, 508 F.Supp. at 1259 (emphasis added). In practice, however, "the line between the two torts is often blurred because comments that disparage a product almost invariably reflect adversely on the manufacturer of the product as well." *Id.* First Act asserted a claim for defamation, but the Court dismissed that claim on a Motion for a Directed Verdict because, generally, where the statement or statements in question involve a company's

than a public figure, it may recover by showing [defendant's] negligence, a lower threshold than 'actual malice.' *These elements of the First Amendment's 'public figure' doctrine apply to product disparagement actions.*

627 F.Supp. at 365 (emphasis added and citations omitted). Based on this language, plaintiff argued that a negligence instruction was appropriate because First Act was a private rather than a public figure. *See Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d 583, 586–92 (1st Cir.1980) (distinguishing private figure corporations versus public figure corporations). Counsel for the defendant argued that actual malice was the appropriate standard *regardless* of First Act's status as a private versus public figure.[4] The Court expressed reservations as to defendant's argument because defendant was able to cite only one case in support of its proposed instruction, *DeCosta v. Viacom Int'l, Inc.*, 981 F.2d 602 (1st Cir. 1992), and even though the *DeCosta* Court

services or product, defamation will not lie unless the statement or statements impute to the corporation fraud, deceit, dishonesty or reprehensible conduct. (*See* Order Granting Def.'s Mot. for Directed Verdict, Nov. 28, 2005 (Docket No. 300)) (citing *Picker Int'l, Inc. v. Leavitt*, 865 F.Supp. 951, 964 (D.Mass. 1994)).

**4.** Defendant's proposed jury instruction read, in pertinent part, that:

> In order to prevail on its claim for commercial disparagement, the plaintiff must prove to you, by a preponderance of the evidence, ... [that] the defendant either intended the publication to cause pecuniary loss or reasonably should have recognized that the publication would result in pecuniary loss ... [and that] the defendant published the statement with actual malice in that the defendant either knew that the statement was false or acted in reckless disregard of its truth or falsity.

(Def.'s Proposed Jury Instruction No. 86 (Docket No. 241–5) at p. 17).

referenced "malice" as the appropriate standard in an action for commercial disparagement, it did so only in dicta. *See DeCosta*, 981 F.2d at 610 (citing *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365, 1373 (10th Cir. 1977) (applying Colorado law)). Believing *Flotech* and *Bose* to be more squarely on point with the issues in this lawsuit, the Court ultimately decided that a negligence instruction was appropriate.[5]

Two questions must be addressed: (1) was the negligence instruction a misstatement of Massachusetts law; and (2) if so, would a properly stated instruction have changed the outcome of the trial? The Supreme Judicial Court of Massachusetts faced the first question in *Dulgarian v. Stone*, but explicitly declined to reach the issue. 420 Mass. 843, 852 n. 9, 652 N.E.2d 603 (1995) ("The plaintiffs argue that malice is not an element of the tort. We do not reach this issue."). The *Dulgarian* Court did, however, cite favorably to § 623A of the Restatement (Second) of Torts, which states that a defendant must know that the statement in question is false or act in reckless disregard of its truth or falsity. Two Massachusetts Superior Court cases have also cited § 623A of the Restatement. *Salloom v. Lister*, No. 99–1063, 2004 WL 1836027, at *2–3

(Mass.Super. Aug. 10, 2004); *Powell v. Stevens*, No.2000–0089, 2004 WL 1047451, at *2–4 (Mass.Super. May 3, 2004). In *Salloom*, as in *Dulgarian*, the court explicitly declined to reach the issue of whether a plaintiff must prove malice. *Salloom*, 2004 WL 1836027, at *4 n. 3 ("The question of whether the plaintiff must prove 'malice' and whether this element is separate and distinct from reckless disregard remains open and need not be answered here.") (citing *Dulgarian*, 420 Mass. at 852 n. 9, 652 N.E.2d 603). Likewise in *Powell*, where the court declined to explicitly adopt a malice standard, but did opine that commercial disparagement requires "proof of a greater amount of fault than negligence on the part of the defendant regarding the falsity of the statement." *Powell*, 2004 WL 1047451, at *3 (citing Restatement (Second) of Torts §§ 623A, 624 (1979)). In sum, the current state of the law in Massachusetts is that courts have refused to explicitly require malice in a commercial disparagement action. It seems, though, that Massachusetts courts may so rule if faced with the issue again. The Court's negligence instruction may, therefore, have been out of step with Massachusetts law, *Flotech* and *Bose* notwithstanding.[6]

---

**5.** The instruction in question was read to the jury as follows:

> To prove its commercial disparagement claim, First Act is required to show by a preponderance of the evidence that Brook Mays was negligent in making a false and disparaging statement of fact pertaining to First Act's products. · Negligence means the failure to exercise the degree of care a reasonably careful person would have exercised in the same or similar circumstances. I'll say that again. Negligence means the failure to exercise the degree of care a reasonably careful person would have exercised in the same or similar circumstances.

(Trial Trans. Day 20 at pp. 113–14).

**6.** It is the judgment of this Court that *Flotech* and *Bose* were correctly decided, that is, the negligence versus malice determination in a commercial disparagement action should be made by reference to the plaintiff's status as a public versus private figure. Even though the public versus private figure dichotomy and other limitations defining the First Amendment's zone of protection were established in the context of defamation, *see, e.g., New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), "they are not peculiar to such actions but apply to all claims whose gravamen is the alleged injurious falsehood of a statement." *See Blatty v. New York Times Co.*, 42 Cal.3d 1033, 232 Cal.Rptr. 542, 728 P.2d 1177, 1182 (1986). Constitutional pro-

Even if the instruction in question did indeed misstate the applicable law, although such is not clear, a new trial may be granted only if the objecting party can show that the Court's error affected the outcome of the trial. *Romano,* 233 F.3d at 667. Brook Mays cannot carry this burden. First Act's cause of action included three claims: false advertising under the Lanham Act, commercial disparagement, and tortious interference with an existing or prospective business relationship. The jury found Brook Mays liable on all three claims, and assessed general damages [7] for lost profits, future lost profits, expenses, and harm to First Act's reputation. (*See* Final Verdict Form (Docket No. 317) at ¶ 6). Assuming *arguendo* that the instruction in question contaminated the jury's decision on commercial disparagement, the outcome of the trial stands unaffected because (1) Brook Mays lost the other two claims; and (2) those claims allow for damages of the type awarded here. *See, e.g., ALPO Petfoods, Inc. v. Ralston Purina Co.,* 913 F.2d 958, 969 (D.C.Cir.1990) (Thomas, J.) (lost profits, future lost profits, and quantifiable harm to goodwill recoverable for false advertising under Lanham Act); *Nat'l Merch. Corp. v. Leyden,* 370 Mass. 425, 430, 348 N.E.2d 771 (1976) (lost profits recoverable for tortious interference with existing business relationship); *Powers v. Leno,* 24 Mass.App.Ct. 381, 385, 509 N.E.2d 46 (1987) (future profits recoverable for tortious interference with prospective business relationship where plaintiff has reasonable expectancy financial benefit). In sum, First Act's verdict stands with or without its claim for commercial disparagement.

tection does not depend, nor should it, solely on the label given a stated cause of action. *Id.*

**7.** Because the three claims charged to the jury presented overlapping issues, the Court

Furthermore, because a reasonable jury could have found malice based on the evidence adduced at trial, any error in the Court's instruction was harmless. *Murray v. United of Omaha Life Ins. Co.,* 145 F.3d 143, 156–57 n. 13 (3d Cir.1998) (denying new trial where the jury would have reached the same result had it been instructed correctly). To reiterate, the malice standard advocated by defendant would have required plaintiff to show, by a preponderance of the evidence, that (1) the defendant intended to cause plaintiff pecuniary loss or reasonably should have recognized that pecuniary loss would result; and (2) the defendant knew the statement in question was false, or acted in reckless disregard of its truth or falsity. (*See* Def.'s Proposed Jury Instruction Nos. 86 & 89 (Docket No. 241–5) at pp. 17, 20). As to the first requirement, the trial record clearly shows that Brook Mays intended or reasonably should have recognized that the ISO Alert would cause First Act pecuniary loss. The text of the ISO Alert itself proves the point:

### I.S.O. ALERT!

#### Instrument Shaped Object

**Attention:** **Music Supervisors**

**Band Directors**

**Instrument Instructors**

Please be **ALERTED** ... there are a number of discount stores, Sam's, Walmart, Costco and Hastings, (to name a few) that are selling beginner "instruments," or "Instrument Shaped Objects" under the name brands of First Act

instructed the jury to return a general computation of damages in lieu of specific damages attributed to each claim. Neither party objected.

Concert Series, SIMBA, Bluebird, Jean Baptiste and others.

After careful examination of these instruments, we have determined that they will not play for the long term (if even the short term)! The ISO's break and parts are NOT available. The unfortunate fact is that the students that will be playing these instruments will likely not survive the first few months of band because of the design and quality. We are all aware that the dropout rate for beginning students is too high. Why would we, in good conscience, allow a student to begin on an instrument that dooms them for failure?

*Because of the design and quality, or lack thereof, we must respectfully decline to work on these or similar instruments.* The liability is too great and we do not wish to be a part in the failure of a student in your schools [sic] instrumental music program.

We sincerely would like to suggest, that for the sake of the child's future in music, these instruments be returned to the big box retailer for a refund and another option sought.

Bill Everitt

CEO

Brook Mays Music Group

(Trial Ex. 1) (emphasis in original). Not only does the ISO Alert directly impugn the design and quality of First Act's band instruments, thereby discouraging future sales, it encourages those who have already purchased First Act instruments to return them and seek another option, thus imperiling past sales. It strains the imagination to figure how any reasonable company could fail to recognize that language of this kind would cause First Act pecuniary harm.

■ The trial record also shows that Brook Mays acted in reckless disregard of the ISO Alert's truth or falsity. Quite contrary to their assertion that the First Act band instruments had undergone a "careful examination," the evidence and testimony at trial showed that Brook Mays never tested, played, or otherwise examined First Act's band instruments before disseminating the ISO Alert. In fact, Brook Mays CEO William Everitt admitted on cross examination that he had never even seen a First Act band instrument prior to July, 2003, when the ISO Alert was first released. (Trial Trans. Day 10 at p. 45). Nor did the other two authors of the ISO Alert, Brook Mays employees Jack Fass and Bill McFayden. (Tr. Trans. Day 10 at pp. 168–70; Day 11 at pp. 55, 58). At most, Brook Mays' repair technicians repaired a limited number of First Act instruments shortly before the ISO Alert was released. Yet it is telling that defendant was unable to present any witness, repair technician or otherwise, to support their claim that plaintiff's instruments had been "carefully examined" *before* the ISO Alert was disseminated. These facts, when viewed in a light most favorable to the plaintiff, *Baron v. Suffolk County Sheriff's Dept.*, 402 F.3d 225, 245 (1st Cir.2005) ("In a post-verdict motion for a new trial, the evidence is viewed in the light most favorable to the verdict."), provide a reasonable basis on which to conclude that Brook Mays acted in reckless disregard of the truth or falsity of the ISO Alert. A malice instruction would not have changed the jury's verdict, and a new trial on that claim is inappropriate.

## II. *Remittitur of Reputation Damages*

First Act presented evidence of damage to its reputation through the testimony of expert witness Ronald Curhan. Professor Curhan testified that a variety of measures were required over a five-year period to repair the reputational damage caused by defendant's ISO Alert. Among them

(costs in parentheses): educational outreach programs for band instrument Educational Representatives and Repair Technicians, and point of purchase marketing materials ($1,230,000); Band Director clinics and implementation of an "Instrument Reward Program" ($4,275,000); and corrective advertising and endorsements ($3,775,000). (Tr. Trans. Day 12 at pp. 39–55). The cost of Prof. Curhan's entire remediation program totaled $9,280,000, of which the jury awarded $5,125,000.

 Under the doctrine of remittitur, a court may condition the need for a new trial on the issue of damages on the prevailing party's acceptance of a reduced sum of damages. Fed.R.Civ.P. 59(a); *Cahill v. TIG Premier Ins. Co.*, 47 F.Supp.2d 87, 89 (D.Mass.1999). The decision to grant or deny a request for remittitur is committed to this Court's discretion. *Huber v. JLG Indus., Inc.*, 344 F.Supp.2d 769, 775 (D.Mass.2003) (citing *Conjugal P'ship v. Conjugal P'ship*, 22 F.3d 391, 397 (1st Cir.1994)). In exercising its discretion, this Court must review the evidence in a light most favorable to the prevailing party and afford substantial deference to the jury's calculation of damages. *Cahill*, 47 F.Supp.2d at 89. However, an award of damages may be reduced if it fails to exhibit a "rational appraisal or estimate of the damages that could be based on the evidence before the jury," or, if it is "grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand." *Smith v. Kmart Corp.*, 177 F.3d 19, 29–30 (1st Cir.1999). A jury's computation of damages is, by its very nature, an imprecise process. This is especially true where a jury must calculate damages for loss of reputation, which, like damages for pain and suffering, are inherently indeterminate, calculated by a measure without bounds. It is necessary, thus, to survey the precedents in order to discern the boundary lines that have been drawn by judicial surveyors. Remittitur is that scope which enables a court, post-trial, to review damages claimed to be excessive and, after close reexamination of the evidence and deliberate reflection, to more accurately calculate them so as to achieve a just result.[8] Here, the jury concluded that $5,125,000 is necessary to repair the damage to First Act's reputation that remains from defendant's ISO Alert. An award of this magnitude does not evince a rational appraisal of damages based on the evidence adduced at trial and is indeed grossly excessive, inordinate, and shocking to the conscience of this Court. To leave such an excessive award unaltered would be a denial of justice; remittitur is appropriate.

This case is atypical from most cases where a plaintiff corporation seeks reputation damages in the wake of another corporation's false and disparaging statements. In a typical case, a plaintiff acts quickly to dispel the defendant's harmful statements by conducting its own corrective advertising campaign well before trial. As a result, by the time a trial has been conducted and verdict rendered, reputation damages are easier to quantify because the plaintiff can represent out-of-pocket corrective advertising costs already incurred as a baseline on which to calculate damages. *See, e.g., ALPO*, 913 F.2d at 969 (plaintiff may recover the costs of any completed advertising that actually and reasonably responds to the defen-

---

**8.** The Court's reexamination and recalculation is not unfettered. The Court of Appeals for the First Circuit has endorsed the so-called "least intrusive" approach, which dictates that a reviewing court may reduce a verdict no further than the maximum amount that could be upheld as not excessive. *Conjugal P'ship*, 22 F.3d at 398.

dant's offending ads); *U–Haul Int'l, Inc. v. Jartran, Inc.,* 793 F.2d 1034, 1041 (9th Cir.1986) (reputation damage award properly based on corrective advertising expenditures made before trial); *Cuisinarts, Inc. v. Robot–Coupe Int'l Corp.,* 580 F.Supp. 634, 641 (S.D.N.Y.1984) (same). Here, First Act seeks *prospective* damages, that is, damages to fund post-trial corrective advertising that has yet to take place.[9] Though recognized as recoverable in certain circumstances, *prospective* remedial advertising is a somewhat novel theory of damages that has been limited[10] in its application. *See PBM Prod., Inc. v. Mead Johnson & Co.,* 174 F.Supp.2d 417, 420 (E.D.Va.2001) ("[T]here have only been a few false advertising case[s] where a federal court granted prospective corrective advertising expenditures."); *Mastercard Int'l, Inc. v. Arbel Corp.,* No. 86 CIV 6801 SWK, 1989 WL 125781, at *6 (S.D.N.Y. Oct. 18, 1989) (novel theory).

A damage award for prospective remedial advertising may stand only if it compensates the injured party for identifiable harm to its reputation. *PBM Prod.,* 174 F.Supp.2d at 420 (prospective corrective advertising expenditures are a surrogate for measuring plaintiff's actual reputational damages). Such awards require careful examination, because reputational harm is inherently more difficult to quantify than strictly pecuniary harms such as lost profits. This is particularly true where, as here, more than two years have passed since the disparaging statements were last disseminated.[11] One noted commentator has gone so far as to opine that:

> [W]hen the future cost of a corrective advertising campaign is characterized as damage inflicted by the defendant, a court ought to engage in the difficult process of determining the appropriate amount of corrective advertising necessary to dispel the lingering effects of the wrongdoer's advertising [and] where a substantial length of time has passed since the defendant's last use of its false advertising . . . no expenditure on corrective advertising can be rationalized as required to correct lingering misimpressions in the minds of purchasers because the passage of time makes it highly unlikely that even 'lingering effects' will still remain in buyers' minds.

Arthur Best, *Monetary Damages for False Advertising,* 49 U. Pitt. L.Rev. 1, 23

---

**9.** First Act spent $30,061 on corrective advertising prior to trial and seeks that amount as well. However, the lion's share of First Act's reputation damages involve funding for prospective measures.

**10.** For example, defendant argues that prospective advertising costs cannot be recovered unless First Act can show that financial constraints prohibited it from conducting remedial advertising prior to trial. Courts have split on this issue, some holding that prospective advertising is recoverable only where a plaintiff has shown it could not afford such advertising before trial, *see, e.g., Simon Prop. Group, L.P. v. mySimon, Inc.,* No. 99–1195–C, 2001 WL 66408, at *26 (S.D.Ind. Jan. 24, 2001); *PBM Prod., Inc. v. Mead Johnson & Co.,* 174 F.Supp.2d 417, 420–21 (E.D.Va. 2001), others finding that prospective advertising damages are available regardless of a

company's financial capabilities, *see, e.g., Adray v. Adry–Mart, Inc.,* 76 F.3d 984, 988–89 (9th Cir.1995) (citing *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.,* 561 F.2d 1365, 1374–76 (10th Cir.1977)). The Court of Appeals for the First Circuit has yet to weigh in on the issue, and this Court declines to do so here in light of (1) its decision to grant a remittitur, and (2) the fact that defendant failed to raise the issue before or during trial.

**11.** On March 4, 2004, this Court issued a preliminary injunction barring defendant from further dissemination of the ISO Alert. (Order Granting Pl.'s Request for Preliminary Injunction, Mar. 4, 2004 (Docket No. 62)). That injunction was made permanent, in pertinent part, on February 8, 2006. (Order Granting Pl.'s Request for Permanent Injunction, Feb. 8, 2006 (Docket No. 372)).

(1987). The issue for this Court, therefore, is twofold: (1) are there lingering effects of the ISO Alert such that First Act continues to suffer identifiable harm to its reputation; and (2) if so, is $5,125,000 a reasonable estimate of the damages required to dispel those lingering effects?

██ That First Act continues to suffer at least some measure of reputational injury is readily apparent from the jury's verdict. It is far less apparent, however, that $5,125,000 is rational appraisal of the damages necessary to make First Act whole. When assessing the jury's calculation of reputation damages, this Court may take into account the difficulty of proving an exact amount of damages from false advertising, as well as the maxim that "the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *ALPO*, 913 F.2d at 969 (citations and internal quotations omitted). At the same time, the Court must ensure that the facts adequately support the damages awarded and establish a causal link between those damages and the plaintiff's injury, lest the award become speculative or punitive. *Id.* This Court has permanently enjoined defendant from future dissemination of the ISO Alert, and indeed, all Brook Mays officers, employees, and agents are prohibited from describing First Act band instruments as "ISOs" or "instrument-shaped objects" under any circumstances. (*See* Order Granting Pl.'s Request for Permanent Injunction, Feb. 8, 2006 (Docket No. 372)). Moreover, more than two years

have passed since the disparaging statements at issue in this case were last disseminated. To the extent lingering effects from the ISO Alert remain in the marketplace, the fact that First Act prevailed in this lawsuit will go a long way toward ameliorating those effects. Recognizing this, First Act issued a press release detailing the outcome of this case one business day after the verdict was rendered. A link to that press release remains on First Act's corporate website today. *See* Press Release, First Act, Inc., First Act Awarded More than $20 Million in Jury Verdict Against Brook Mays Music (Dec. 5, 2005), *available at* http://www.firstact .com (last visited Apr. 26, 2006).

Simply put, First Act can restore its reputation for far less than $5,125,000. *See Simon Property*, 2001 WL 66408, at *25 (money damages sought for corrective advertising must be related to injury). Of the various components included in Prof. Curhan's remediation program,[12] only two are reasonably necessary to dispel any lingering effects that remain from defendant's ISO Alert—corrective advertising in trade and consumer press, and print media advertising. The other measures are unreasonable, unnecessary, and, in some cases, would be plainly futile.[13] According to Prof. Curhan, the funding needed to carry out the remaining advertising components for one year is $125,000 for trade and consumer press, and $400,000 for print advertising. (Tr. Trans. Day 12 at pp.

12. To reiterate, Prof. Curhan's remediation program included six main parts: (1) educational outreach seminars for band instrument Educational Representatives and Repair Technicians; (2) point of purchase marketing materials; (3) Band Director clinics; (4) implementation of an "Instrument Reward Program;" (5) endorsements; and (6) corrective advertising. (*See* Tr. Trans. Day 12 at pp. 39–55).

13. For example, Prof. Curhan opined that First Act should coordinate a series of seminars in order to educate Brook Mays' Educational Representatives and Repair Technicians as to the quality of First Act Band Instruments. However, First Act and Brook Mays are competitors. It is difficult to imagine a scenario in which Brook Mays employees would even attend such a seminar, let alone change their minds as to the quality of First Act products.

47–50). It is hereby ordered, therefore, that defendant's Motion for a New Trial is conditionally granted on the issue of reputation damages unless the plaintiff files with the Clerk of this Court a written consent to a reduction of the verdict to a sum of $16,198,370 within fourteen days of this Memorandum and Order. This remittitur reflects a reduction of the jury's reputation damages award from $5,125,000 to $555,061, comprised of $125,000 for advertising in trade and consumer press; $400,000 for print advertising; and $30,061 for corrective advertising expenses incurred by plaintiff before trial.

## CONCLUSION

Defendant's request for Judgment Notwithstanding the Verdict is denied. Defendant's Motion for a New Trial and Remittitur is also denied, except that a remittitur of $4,569,939 is granted with respect to the damages awarded by the jury for harm to and remediation of First Act's reputation.

SO ORDERED.